## LONG *v.* THE TAMPICO.

### SAME *v.* THE PROGRESSO.

*(District Court, S. D. New York. May 22, 1883.)*

1. SALVAGE—REASONABLE APPREHENSION OF IMMEDIATE DANGER.
   A reasonable apprehension of immediate danger is a sufficient basis for an award of salvage compensation for rescuing vessels from fire.

2. SUIT AGAINST UNITED STATES—IN PERSONAM.
   No suit can be maintained against the government *in personam;* and the same immunity is extended by comity to foreign sovereigns with whom this country is at peace, and no attachment or garnishee process can be sustained at common law, whereby the public property of a foreign government can be attached.

3. SAME—IN REM.
   No suit *in rem* in admiralty can be sustained, or seizure made by the marshal, under process against property of the government devoted to public uses, and in possession of an officer of the government.

4. FOREIGN GOVERNMENTS—IMMUNITY FROM SUIT.
   The same immunity from seizure is by comity extended to the property of a foreign government in the public service and in possession of its officers.

5. SAME—ATTACHMENTS IN REM.
   Attachments *in rem* may, however, be enforced by seizure in admiralty against property of the government, if it be not at the time of the seizure in the public service, or in the possession of any officer of the government, but in the hands of a private bailee, for transportation merely. No greater exemption can be claimed in behalf of the property of a foreign government.

6. SAME—SALVAGE—BURDEN OF PROOF.
   In claiming exemption from seizure upon a lien for salvage services, the burden of proof is upon those claiming the exemption, and it should appear clearly that the property had become the property of the government, and in possession of some person proved to be its officer or representative.

7. SAME—IMMUNITY—BY WHOM CLAIMED.
   Immunity from seizure can only be claimed by the government itself, or by some proved or recognized officer or agent intervening in its behalf. Intervention by a private citizen merely describing himself as agent. without proof, should not be deemed sufficient.

8. CASE STATED.

Where two steam-cutters, the P. and the T., designed for the public service of Mexico, were constructed in New York, under a contract with one O., describing himself as agent of the Mexican government, and after completion were delivered to O. at New York, by whom they were turned over to Capts. H. and D., to be taken by them to Vera Cruz, for the sum of $300 each, and there delivered to the Mexican authorities; and on the following day, after being placed in charge of Capts. H. and D., were rescued by the steam-tug J. from a fire which broke out near the wharf where they were lying, and the actual authority of O., or his relations to the Mexican government, or his contract with them, if any, did not appear,—*held*, that the two cutters were subject to a lien for salvage, and that the libel against them should be sustained, as it did not appear clearly that the property in the vessels had passed to the Mexican government; and because, if it had passed, they were not at the time of the libel in the public service of that government, nor in possession of any officer thereof.

In Admiralty.

*Beebe, Wilcox & Hobbs* and *R. D. Benedict,* for libelants.

*Condert Bros.,* for claimants.

BROWN, J.   The libels in the above cases were filed by the owners of the steam-tug Joe, and all others in interest, to recover compensation for services alleged to be of a salvage character, in rescuing the Tampico and the Progresso from a fire which broke out at Pratt's oil docks, on Sunday evening, August 8, 1880.

Salvage compensation has been recently allowed by this court for services rendered to the Cyclone, (*ante,* 486,) in the same fire.   Some of the facts bearing upon the present claim are there stated, and need not be here recapitulated.

The Tampico and the Progresso were two small steamers, about 65 feet in length, which had just been built at Greenpoint, and were designed for the Mexican government, to be used as revenue cutters. At the time the fire broke out on board the Nictau they lay moored along-side of each other, on the side of the slip opposite the Nictau, from 100 to 125 feet distant from her, on the southerly side of the Manhattan railway pier, and from 100 to 150 feet inside of the outer end of that pier.   The engineer and the fireman, with the aid of some other attendants, hauled the Tampico towards the outer end of the pier, and there hailed the steam-tug Joe, which had come up to render assistance.   The tug made fast to the Tampico and hauled her a short distance away from danger of the fire, and immediately returned and towed the Progresso, which had also been moved out towards the end of the slip, to the same place, and afterwards towed them both to a place of safety.   As the Progresso was towed out from the slip, the Cyclone, already on fire, swung across the slip, and

her bows, carried upward by the flood-tide, struck the piles near the end of the pier where the Tampico and Progresso had been, and there became entangled so as to obstruct further egress from the slip until she was towed away. A third cutter, the Campeachy, lying further inside the slip, having her retreat thus cut off, was carried as far as possible towards the bulk-head, where she escaped injury.

At the time when the Joe was called and rendered her assistance, there were evident grounds of alarm for the safety of the cutters. The sails of the Progresso had caught fire, but the flames had been put out by the use of pails of water. The extent of the fire could not be foreseen; the situation was one of strong apprehension of immediate danger; and that is a sufficient basis for an award of salvage compensation. *McConnochie* v. *Kerr*, 9 FED. REP. 50, 53, and cases there cited. There is some question whether in the strong flood-tide the few hands then on board these vessels would have been able to haul either of them out beyond the end of the pier, on account of the strong pressure against the end of the pier as soon as the vessels were brought out so as to catch the strong upward current. But I think the evidence shows that even if the men on board could have done this, before they would have had time to accomplish it unaided, the Cyclone, which had been cut loose to escape from the Nictau, in drifting to the pier where she became entangled, would have crashed into one or both of the cutters, and inflicted more or less severe damage, and possibly have sunk them.

The assistance rendered by the Joe was, therefore, most timely. It was the first help that arrived at the spot. The service was, however, short,—hardly more than half an hour, altogether,—was not difficult to perform, and was towage only; nor was it attended with danger to life or limb.

Objection is made, however, that these cutters were at this time the property of the Mexican government, and in its possession, and were, therefore, exempt from seizure under process of this court for the enforcement of the salvage claim. The answers deny that said vessels were within the admiralty and maritime jurisdiction of the court, and aver that "said steamers were foreign public vessels; owned and commissioned by the republic of Mexico, a sovereign state at peace with the United States, and exempt from the jurisdiction of the courts of this country." The question thus presented has been carefully argued upon both sides.

The elaborate and exhaustive examination given to the subject of the exemption of the property of a sovereign power in the cases of

*The Exchange,* 7 Cranch, 117; *Briggs* v. *Light-boats,* 11 Allen, (Mass.) 157; and *The Parlement Belge,* (1880,) on appeal, (5 Prob. Div. 197,) renders superfluous any further examination of the general principles involved.    These cases fully sustain the general proposition that the property of a government, while in its possession and employed in or devoted to the public use, is exempt from judicial process, on the ground that the exercise of such jurisdiction is inconsistent with the independence of the sovereign authority and the necessities of the public service.    In the late case of *The Fidelity,* 16 Blatchf. 569, the steam-tug Fidelity, being the property of the municipality of this city, and devoted in its daily operations to the public uses, was upon this ground held exempt from seizure on a claim of damage; and the libel *in rem* was dismissed.    WAITE, C. J., says:

"A public vessel is part of the sovereignty to which she belongs, and her liability is merged in that of the sovereign. Under such circumstances redress must be sought from the sovereign, and not from the instruments he uses in the exercise of his legitimate functions."

He adds:

"Property does not necessarily become a part of the sovereignty because it is owned by the sovereign. To make it so, it must be devoted to the public use, and must be employed in carrying on the operations of the government."

In the case of *Briggs* v. *Light-boats,* GRAY, J., says:

"After they had once come into the possession of the United States for public uses, whether remaining at the builder's wharf or at the station of their final anchorage, or on their way from the one to the other, they were subject to the exclusive control of the executive government of the United States, and could not be interfered with by state process. The immunity from such interference arises, not because they are instruments of war, but because they are instruments of sovereignty, and does not depend on the extent or manner of their actual use at any particular moment, but on the purpose to which they are devoted."

In the last case the light-boats had been constructed for the uses of the United States government, and attachment proceedings were taken against the vessels under a lien law of Massachusetts in favor of workmen; but prior to the commencement of the suit the vessels had been delivered over by the contractors to the United States authorities, who had already fully paid for them and had partly manned and equipped them for their destined public uses.    GRAY, J., says:

"If they [the petitioners] had filed their petitions and attached the vessels before these came into the possession of the United States, they might well have contended that the courts of the commonwealth had acquired a jurisdic-

tion of the cases which could not be divested until the object of the suits was accomplished."

In the case of *The Davis*, 10 Wall. 15, compensation was claimed for salvage services rendered in saving certain cotton, the property of the United States, while on board the schooner Davis, upon which the cotton had been sent from Savannah, by an agent of the government there, and consigned to himself or his assigns in New York. Two questions were determined by the court: *First*, that personal property of the United States might become subject to a lien for salvage services; *second*, that no such claim could be enforced by suit *in rem*, when it would be necessary to invade the actual possession of the United States authorities, or to take such property out of the possession of the government by any writ or process of the court. It was held, however, that the cotton was not in that case in such a sense in the possession of the United States as to exempt it from proceedings *in rem*, having been delivered to the master of the vessel for transportation to New York, and being in his custody at the time the libel was filed. The court say:

" The possession of the master of the vessel was not the possession of the United States. He was in no sense an officer of the government. * * * His obligation was to deliver possession in New York to the agent of the government. This he had not done when the process was served on the cotton. * * * The United States, without any violation of law by the marshal, was reduced to the necessity of becoming claimant and actor in the court to assert their claim to the cotton."

On this ground the libel was upheld and salvage compensation enforced.

In the case of *The Fidelity*, WAITE, C. J., observes, in regard to *The Davis*, that "the cotton does not appear to have been in any manner devoted to the public use, or connected with the operations of the government."

By international comity, and that tacit agreement which constitutes the law of nations, every government accords to every other friendly power the same respect to its dignity and sovereignty, and the same consequent immunity from suit, both as respects the person of the sovereign as well as the national property devoted to the public service, which it enjoys itself within its own dominions. As a government cannot be impleaded in its own courts without its consent, so no personal suit can be maintained against a foreign sovereign; nor, as incidental to such suit, can any attachment be levied in the courts of common law, or any garnishee process be maintained

against the property of a foreign government. *De Haber* v. *Queen of Portugal*, 17 Q. B. 169; *Twycross* v. *Dreyfus*, 5 Ch. Div. 605; *Leavitt* v. *Dabney*, 7 Robt. 354.

If, at the time the salvage service in this case were rendered, the Tampico and the Progresso had passed into the full and complete possession of the Mexican government, so as already to belong to the public service of that country, then these vessels must be held exempt from seizure under process of this court if the objection has been duly taken and presented to the court.

On the part of the libelant it is urged that any claim to exemption which the government of Mexico might have, is not presented in a manner which entitles it to the consideration of the court; that no officer of the United States has appeared to protest against these proceedings in defense of the sovereignty of a friendly power, as in case of *The Exchange* and *The Parlement Belge;* and that neither the Mexican minister, nor the Mexican consul, nor any other accredited or proved agent of the Mexican government, has appeared to assert any such immunity.

Upon the seizure of the vessels by the marshal under process, a claim was interposed in the ordinary manner by Henry C. de Rivera, "intervening as agent for the interest of the republic of Mexico." In this claim he averred that "he was in possession of the said steamer at the time of the attachment thereof, and that the republic of Mexico is the true and *bona fide* sole owner of the said steamer, and that no other person is the owner thereof, and that said Henry C. de Rivera is the true and lawful bailee thereof as agent; wherefore, he prays to defend accordingly." The usual bonds were filed to release the vessels from custody, and they were thereupon discharged. Answers were subsequently put in by Henry C. de Rivera "as agent of the republic of Mexico, intervening for the interest of his principal," and were signed by him as agent for that republic, in which there are pleas to the merits, as well as to the jurisdiction of the court, in the language first above quoted.

Although objection to the jurisdiction alone might doubtless have been raised upon the information of the attorney general of the United States, or the direct intervention of the accredited political representative of the Mexican Government, I see no reason to disregard the mode of intervention adopted in this case, viz., by some other agent of the government, provided he was duly authorized thereto. The execution of the bonds to obtain the discharge of the vessels was no waiver. In this respect, as well as in proceeding by plea to the juris-

diction, the case is like that of *The Fidelity*, 9 Ben. 333; 16 Blatchf. 569.

But in the case of a private person like Mr. de Rivera, intervening in behalf of a foreign government, proper proof of his authority, as a fact material to the defense, ought to appear. It could not be permitted that vessels should be exempted from ordinary judicial process, and the libel dismissed upon the mere intervention of a private citizen, simply describing himself as the agent of a foreign country, without any proper proof of that fact, or of his authority to intervene. In a meritorious case, a foreign government may choose to waive its privilege, or may consent that the court proceed, as in the case of *The Prins Frederik*, 2 Dod. 481, 484. No direct evidence was given of any authority in Mr. de Rivera to represent the Mexican government. Mr. Navarro, however, the consul general of Mexico at this port, was called as a witness on behalf of the claimants, but without throwing any light on this point.

Without considering this point further, however, I proceed to the important inquiries whether, at the time the services were rendered, these vessels were in the possession of the Mexican government, or belonged to or formed a part of the public service of that country.

The vessels in question were built in this city, by the New York Safety Steam-power Company, under a contract, dated December 17, 1879, between that company of the first part, and "Antonio Obregon, acting as agent in commission for the supreme government of Mexico, the terms of payment being guarantied by Messrs. J. de Rivera & Co., of New York city, merchants, as parties of the second part." The party of the first part agreed to build the two vessels within 12 weeks, and to deliver them under steam at this port, after a trial trip of sufficient duration and extent to thoroughly test and prove the machinery and the vessels, and demonstrate their efficiency. The parties of the second part agreed to pay $16,000; $2,000 after the boats were begun, $6,000 after they had been launched, and the balance of $8,000 when delivered under steam. The contract is signed by Obregon individually, and by J. de Rivera & Co. Mr. Kino, one of the firm of Rivera & Co., testified that they became parties to this contract as guarantors, in consideration of a commission of $2\frac{1}{2}$ per cent., which was to be paid to them by Obregon, and which he subsequently paid them. The testimony shows that the vessels were delivered to Obregon by the builders, and accepted by him on the seventh of August, 1880, the day previous to the fire, after trial trips which

v.16,no.4—32

had proved satisfactory; and all the money was paid. Mr. Navarro testified: "I never received directions from my government in the form of direct communication; but I received orders, I think, from the minister of finance, directing me to give money for the construction of these vessels; and I think the whole of the money was given by me;" that he paid the money by checks, which were delivered to Obregon, but which by his direction were drawn to the order of Rivera & Co.; and that he, the consul, was not connected with the matter, except in the way above stated.

On the sixteenth of July, 1880, Obregon, "as agent of the Mexican government," entered into a written agreement with Capt. J. W. Hudson, whereby Obregon agreed to deliver as soon as ready, and the captain agreed to take command of the Mexican steam-cutter Progresso, and take her with all possible dispatch to the port of Vera Cruz, and there deliver her to the collector of the port; and Obregon agreed to pay Hudson for his services $300—half when the steamer sailed, and the balance "on her proper and correct delivery at Vera Cruz, to be paid by the collector at the port of Vera Cruz." By another contract of the same date, a similar agreement was made between Obregon and Capt. James Durfee in regard to the Tampico.

On July 31st, Mr. Navarro, as consul general of Mexico, issued a provisional register for each vessel, which, after reciting that the steamer had been built in New York "for account and by order of the supreme Mexican government, to serve as coast guard in the waters of the gulf of Mexico," declared that the steamer was authorized to carry the Mexican flag; that a passport was given to her captain from New York to Vera Cruz, but to be of no effect after the vessel should have arrived at the port, and requesting all civil and military officers to regard the steamer as Mexican.

Capt. Hudson testifies that his contract with Obregon, although bearing date the sixteenth of July, was not in fact executed until about the sixth or seventh of August, and that he then went aboard of the Progresso and took command of her at the time of the trial trips; that he was aboard during part of Sunday, the 8th, but was absent from it at the time the fire broke out in the evening. The seamen were procured here by Capt. Hudson, and shipped under American shipping articles in the usual form on the seventh of August for a voyage from New York to the gulf of Mexico, and all except the master and first engineer were to have their passage back to New York paid. Some of them were aboard at the time of the fire. The

first engineer was hired by Mr. Rivera and was aboard at the time of the fire.

The present libels were filed on August 9th, and both vessels, being released on bond, sailed on the tenth of August from New York for Vera Cruz in company, pursuant to the agreement. The Progresso, having met with an accident in the gulf of Mexico, arrived at Vera Cruz on August 31st, somewhat damaged, a few days after the arrival of the Tampico. Both vessels were there tendered to the collector of the port, pursuant to the agreement with Obregon. The Tampico was accepted; but the collector and the other Mexican authorities there refused to receive the Progresso on account of the injuries she had sustained. The vessels had been insured in New York by Mr. Rivera for the benefit of whom it might concern, and Mr. Rivera, in the settlement of the loss, acted in behalf of the insurance company, and, as he testified, not as the agent of the Mexican government.

Upon these facts it seems clear that the vessels at the time of the salvage services, on August 8th, were neither employed in, nor as yet formed any part of, the public service of the Mexican government. They were designed for that service, but were. not yet employed in it; they had been put in charge of Capt. Hudson and Capt. Durfee, to be navigated to Vera Cruz for delivery to the public authorities there. Neither while lying in New York awaiting the voyage thither, nor until acceptance by the Mexican authorities at Vera Cruz or elsewhere, could such public service commence. Their situation before that was merely preparatory to being accepted for the public service. Nor am I satisfied, upon the evidence in this case, that the possession of Mr. Obregon, from the time when the vessels were delivered to him by his contractors after the trial trip on the sixth or seventh of August, can be deemed to be the possession of the Mexican government, or that he was any such officer of that government as rendered his possession the possession of that government. His relations to the Mexican government are not at all made known.

The refusal of the Mexican authorities, however, to accept the Progresso on arrival at Vera Cruz, on account of damages on her way out, is a strong indication that there were some stipulations or conditions in regard to the acceptance of the vessels in the arrangement between the government and Obregon, whatever arrangement that was. Mr. Navarro testifies:

"*Question.* Do you know about what time these cutters were accepted by the Mexican government? *Answer.* As soon as they arrived; except, of course, the one that had the accident. *Q.* Do you know when the one that had the accident was accepted? *A.* It could not be accepted unless it was in good condition."

Mr. Obregon was not examined as a witness, though here a part of the time during the pendency of these actions. No contract or agreement between him and the Mexican government has been offered in evidence; nor is there any testimony in the case showing his appointment as an officer of any sort, or even his employment in behalf of the Mexican government, or any authority to represent them in any way; and, consequently, none of the conditions or stipulations appear which affected the acceptance of these vessels, whatever they were. The only evidence on the subject is indirect and inferential, and consists merely of recitals describing him as agent, in the documents above referred to.

In claiming exemption from the ordinary process of the court, the burden of proof is clearly upon the claimant to prove, by competent evidence, all the facts necessary to sustain this defense. If Mr. Obregon was in fact an officer or authorized representative of the Mexican government, or if the terms of any contract between him and that government were such as made the vessels the property of the Mexican government before delivery and acceptance at Vera Cruz, I cannot doubt that these facts would have been made to appear. In the absence of proof of either of those facts, every intendment is to the contrary. The mere recital in Obregon's contract with the steam-power company, the builders of the vessel, that he was the agent of the Mexican government, is not sufficient proof that when the vessels were delivered to Obregon on the seventh of August his possession is to ,be deemed the possession of the sovereignty of the republic. If the vessels had been built under the direct authority or contract of the Mexican government, and not through Mr. Obregon as a separate agency, from whom the Mexican government was to receive and accept them under specific conditions, it is scarcely credible that a commission of 2½ per cent. would have been paid to Rivera & Co. to guaranty payment to the builders here, when Mr. Navarro, the consul, paid over the whole money, or that any question about acceptance would have arisen at Vera Cruz. The evidence, such as it is, warrants the inference that Obregon had undertaken, upon some contract with the Mexican government, to build these vessels and deliver

them to the public authorities at Vera Cruz; that he was without sufficient money or credit here, and therefore obtained Rivera & Co., merchants of this city, to join in his contract here as guarantors, for which he paid them a commission; and his description of himself as agent of the Mexican government was probably designed only to help give him credit and standing.

I think, therefore, the libel should be sustained on the ground that the vessels at the time of the salvage service neither formed part of the public service of Mexico, nor were as yet the property or in the possession of that government.

But if, on fuller evidence of the facts, it should appear that Mr. Obregon was an officer of the Mexican government, and that the vessels became the property of the government and in its legal possession upon their delivery to Mr. Obregon on August 6th or 7th, still the decision in the case of *The Davis*, which is binding on this court, would be applicable. For the contracts made with Capt. Hudson and Capt. Durfee show that the possession of the vessels was delivered by Obregon to those captains respectively, as bailees, by whom they were to be delivered to the Mexican republic at Vera Cruz. In this respect, therefore, the case would seem to be identical with that of *The Davis*, 10 Wall. 15, where the cotton, though the undoubted property of the government, was delivered to bailees for the purpose of transportation and delivery to the government agents in New York. The salvage service having been rendered after delivery to the bailee and while in his possession, the supreme court held that the property was liable to contribute, and that the action *in rem* would lie.

In the *U. S.* v. *Wilder*, 3 Sumn. 308, Story, J., held that government property in possession of the master and owners of a ship on which it had been laden for transportation, could hold it for payment of its share of general average contribution.

In this case, as in that of *The Davis*, the salvage service was rendered after the delivery of the property to Capts. Hudson and Durfee for transportation and delivery to the government officers at Vera Cruz; the attachment of the vessels in these suits was made while the vessels were in their charge; they were not officers of the Mexican government; and the arrest of the vessels in these actions was made without invading the possession of that government. The libels must, therefore, be sustained.

Upon the facts in regard to the salvage services which are above stated I think 7 per cent. upon the valuation, being the sum of $630,

will be a suitable award in each case, with costs; one-half to be paid to the owners of the Joe, and out of the residue $150 to be paid to the captain in each case, and the rest to be divided equally among the crew.

———

Since the above was written, the attention of the court has been called to the exhaustive opinions delivered in the supreme court in the recent case of *U. S.* v. *Lee,* 106 U. S. 196, [S. C. 1 Sup. Ct. Rep. 240;] but it is not perceived that there is anything in the opinion, either of the majority of the court or of the judges dissenting, at variance with the result of the foregoing decision.