## THE JOHNSON LIGHTERAGE CO. NO. 24.

### (District Court, D. New Jersey. February 23, 1916.)

INTERNATIONAL LAW ⊂⊃10—JURISDICTION—PROPERTY OF FOREIGN GOVERNMENT—SUIT IN REM FOR SALVAGE.

A suit in rem may be maintained against property of a foreign government, although destined for its public use, to recover for salvage services rendered in saving it while in the possession of a lightering company, which had contracted to transport it from a railroad terminal to a vessel, but had no other connection with the foreign government, and where the property was still in its possession when libeled and seized by the marshal.

[Ed. Note.—For other cases, see International Law, Cent. Dig. §§ 10, 11; Dec. Dig. ⊂⊃10.]

In Admiralty. Suit for salvage by the members of the firm of W. J. Scanlan Company against the deck scow Johnson Lighterage Company No. 24 and its cargo. On order to show cause why the cargo should not be released from seizure and delivered free and discharged thereof to its owner, the Russian government. Order discharged.

Foley & Martin, of New York City, for libelant.

John P. Murray (amicus curiæ) and Charles A. Conlon, both of New York City, for the rule.

J. Warren Davis, U. S. Atty., of Trenton, N. J., amicus curiæ.

HAIGHT, District Judge. The persons composing the partnership firm of W. J. Scanlan Company filed a libel in this court against the deck scow Johnson Lighterage Company No. 24 and its cargo, to recover for salvage services, alleged to have been rendered to such vessel and cargo. Process was thereupon issued, and by virtue thereof the vessel and cargo were seized by the marshal. Subsequently certain affidavits were filed on behalf of the Russian government with the Department of State, the purport of which was that the cargo (which consisted of munitions of war) was its sole and exclusive property. Upon these affidavits being brought to the attention of the court an order was made, directing the libelants before mentioned, as well as the Seaboard Equipment Corporation (the alleged owner of the vessel which rendered the salvage services, and which had also filed a libel for the same services), to show cause why the cargo should not be released from seizure and delivered, free and discharged thereof, to the Russian government. Mr. John P. Murray, who made one of the affidavits and who was therein stated to be one of the counsel for the Russian government, was designated amicus curiæ.

Upon the return of the order to show cause, testimony was taken respecting the character, ownership, and possession of the cargo at the times the salvage services were rendered and seizure made. I have no hesitancy in finding, as a fact, that the cargo was, at the times before mentioned, the property of the Russian government. In view of the conclusion which I have reached upon the whole matter, it seems unnecessary to state the reasons upon which this finding is based, especially since they were fully indicated to counsel at the conclusion of the hearing. It is also an uncontradicted fact that, at these times, the cargo was in the possession of the Johnson Lighterage Company (the charterer of the vessel upon which it was loaded) for the purpose of transportation from a railroad terminus in Jersey City to a vessel or vessels in New York Harbor, which latter were under the control of the Russian government. The transportation was undertaken by the Johnson Lighterage Company pursuant to a contract theretofore made between it and the commercial attaché of the Russian general embassy, whereby the former undertook, for certain prices, to transport and lighter such freight as the latter might desire to be carried from incoming railroads to ships of the Russian volunteer fleet, or any other line loading at a certain place in New York Harbor. As the cargo consisted of munitions of war, it will, of course, be presumed that it was destined for the public use of the Russian government.

It is undoubtedly the general rule that the courts of this country are without jurisdiction to entertain, except by consent, either an action in personam against our own government or that of a friendly foreign nation or sovereign, or an action against its property in its possession and devoted or destined to be devoted to the public use. The Siren, 7 Wall. 152, 154, 19 L. Ed. 129; Stanley v. Schwalby, 147 U. S. 508, 512, 13 Sup. Ct. 418, 37 L. Ed. 259; The Exchange, 7 Cranch, 116, 3 L. Ed. 287; Tucker v. Alexandroff, 183 U. S. 424, 440, 463, 22 Sup. Ct. 195, 46 L. Ed. 264; Hassard v. United States of Mexico, 46 App. Div. 623, 61 N. Y. Supp. 939; Briggs v. Light Boats, 11 Allen (Mass.) 157. But there is what may be termed an exception to this rule, although it is probably not strictly such, which was enunciated and applied by the Supreme Court, so far as our own government is concerned, in The Davis, 10 Wall. 15, 19 L. Ed. 875, and followed and applied as to a foreign government by Judge Brown, in the Southern district of New York, in Long v. The Tampico (D. C.) 16 Fed. 491. This so-called exception, I think, must control the questions to be decided in the case at bar. In the former of these cases it was held that personal property of the United States on board a private vessel for transportation from one point to another was liable to a lien for services rendered in saving it, and although such lien could not be enforced by a suit against the United States, or by a proceeding in rem, when the possession of the property could only be had by taking it out of the actual possession of an officer of the government, yet it could be enforced by a proceeding in rem where the process of the court could be enforced without disturbing the possession of the government. In that case a treasury agent of the United States had shipped a quantity of cotton from Savannah on a schooner belonging to and under the

control of a private individual, consigned to another agent of the government in New York. During the voyage the vessel met with disaster, and she and her cargo were saved from total loss by the libelants. Before any of the cotton was delivered to the agent in New York, the vessel was libeled for the salvage services and taken possession of by the marshal. It was held that it was the duty of the court to enforce the lien of the libelants for the salvage before it restored the cotton to the custody of the officers of the government. The facts respecting the possession of the property at the time the salvage services were rendered and the seizure made by the marshal were thus stated by Mr. Justice Miller, who delivered the opinion of the court (10 Wall. 21, 19 L. Ed. 875):

"Bringing the facts of the case before us to the test of these principles, the case was the usual one of a common carrier contracting to deliver goods on his own responsibility, and not the case, as alleged by the United States, of a charter of the vessel. The goods were then delivered to the master, and he contracted to deliver them to the agent of the United States in New York. Immediately on her arrival, and before any of the cotton was delivered to the agent, the vessel and cargo were libeled and taken possession of by the marshal under the writ which issued on the libel being filed. The possession of the master of the vessel was not the possession of the United States. He was in no sense an officer of the government. He was acting for himself, under a contract which placed the property in his possession and exclusive control for the voyage. His obligation was to deliver possession in New York to the agent of the government. This he had not done when the process was served on the cotton. The marshal served his writ and obtained possession without interfering with that of any officer or agent of the government."

In Long v. The Tampico two vessels which were built for the Mexican government were saved from burning at the dock at which they were moored in New York, and the libel was filed for the services thus rendered. It appeared that the agent of the Mexican government who had caused them to be built had, before the salvage services were rendered, entered into a contract with two independent sea captains to navigate the respective boats to Vera Cruz, Mexico, for delivery to the public authorities there. The captains had gone aboard the vessels and taken command before the fire. Judge Brown held (following the case of The Davis, that, assuming that the vessels had become the property of the Mexican government and were in its legal possession before the fire, still, as the salvage service had been rendered after delivery of the boats to the bailees, who were not officers of the Mexican government, for transportation and delivery to the government officers at Vera Cruz, and as the attachment had been made while the vessels were in the charge of the former, that the action in rem would lie, and the libels were sustained.

There is no essential difference between the material facts in the case at bar and those which were presented in The Davis and in Long v. The Tampico. It is true that in the Davis Case the person in whose possession the goods were at the time of the seizure was described therein as a "common carrier"; but I cannot conceive that this fact would make any difference. He was none the less a bailee for hire. The Johnson Lighterage Company, while it may not be strictly a com-

mon carrier, in the sense that it is subject to all of the peculiar liabilities which attach to a common carrier, was no more an officer of the Russian government than were the master of the vessel in the Davis Case and the captains in the Tampico Case. The Johnson Company contracted to deliver the goods on its own responsibility; the Russian government had not chartered the vessel upon which the munitions were loaded, nor, for that matter, any vessel of the Johnson Company. The latter was acting for itself under a contract which, necessarily, during the time of the transportation, placed the property in its possession and control. The Russian government, doubtless, could direct to what vessel or vessels the cargo was to be delivered; but this fact in no respect took the property out of the possession and control of the Lighterage Company during the time of transportation.

In the absence of treaty provisions, I know of no principle which, in a case such as this, would afford a foreign government greater immunity from judicial process than that which is enjoyed by our own government. The immunity granted to friendly foreign governments rests upon international comity (The Exchange, supra; The Santissima Trinidad, 7 Wheat. 253, 352, 5 L. Ed. 454); but the underlying principle upon which the immunity is granted is, nevertheless, the same in both cases, namely, that the exercise of jurisdiction is inconsistent with the independence of sovereign authority and public policy. See The Siren, supra; Stanley v. Schwalby, The Parliament Belge, 5 Prob. Div. 197; Long v. The Tampico, supra.

I therefore conclude that the property in question, although it belonged to the Russian government and was destined to its public use, was subject to a lien for salvage services rendered in saving it, and that as it was not at that time, or at the time of its seizure by the marshal, in the actual possession of an officer of the Russian government, the lien may be enforced in this court by a proceeding in rem. I understand that an interlocutory decree has been entered by default (the time in which to file a claim and answer having expired). I feel, however, that because of the peculiar circumstances of this case the decree should be opened in order to permit a claim and answer to be filed by any one duly authorized to do so, provided that a motion to that effect is made within a reasonable time.

The order to show cause will accordingly be discharged.