THE FLORENCE H.

(District Court, S. D. New York. April 22, 1918.)

1. ADMIRALTY ⬅➡43—JURISDICTION—LIBEL.
    Regardless of the general principles that a vessel owned by the United States and in its possession is immune from any process of court, a vessel requisitioned by the United States Shipping Board Emergency Fleet Corporation for national purposes connected with the war, and delivered by the Fleet Corporation to the United States Shipping Board, a governmental agency, and registered in the name of the United States, is subject to arrest under libel for collision in the high seas while manned by a French crew, though the vessel had been chartered by the Shipping Board to the French government to transport a cargo of food; Shipping Act Sept. 7, 1916, c. 451, § 9, 39 Stat. 730 (Comp. St. 1916, § 8146e), declaring that vessels, while employed solely as merchant vessels, shall be subject to all laws, regulations, and liabilities governing merchant vessels, whether the United States be interested therein or not.

2. COLLISION ⬅➡115—VESSEL—LIABILITY.
    It is settled in admiralty that a ship is liable for the tortious acts of any one who lawfully comes in possession of her and directs her navigation, be he charterer, agent, or crew.

3. COLLISION ⬅➡115—LIEN OF.
    Where a vessel, requisitioned by the United States Shipping Board Emergency Fleet Corporation and chartered to the French government, damaged a British vessel in a collision, such vessel is subject to the lien

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of collision, though belonging to the United States and operated by a French crew; Shipping Act, § 9, having made vessels so taken, while employed as merchant vessels, subject to laws, regulations, and liabilities governing merchant vessels.

4. ADMIRALTY ⟬⟬6—JURISDICTION.

Despite the rule that the act of a sovereign cannot be illegal within its borders, a libel against an American vessel requisitioned by the United States Shipping Board Emergency Fleet Corporation, and chartered to the French government on account of a collision occurring on the high seas, while the vessel was in charge of a French crew cannot be denied, because it would involve a scrutiny of the conduct of the French crew; the republic of France having no jurisdiction over the high seas, and the court not being subject to a diplomatic embarrassment.

5. ADMIRALTY ⟬⟬6—COURTS—AUTHORITY OF.

A court is not authorized to treat in any fashion with foreign powers, and should be quite inaccessible to any suggestions based on international considerations, therefore a court of admiralty will not in its discretion dismiss a libel on the ground that it would involve the scrutiny of the conduct of seamen or agents of the French government, unless a suggestion of diplomatic embarrassment be made by the officers of the government responsible as to those relations.

In Admiralty. Libel by H. E. Moss & Co. against the steamer Florence H. On objections to the jurisdiction of the court. Objections and suggestions overruled, and cause allowed to proceed.

H. E. Moss & Co., the owners of the British vessel Mirlo, filed a libel in rem against the steamer Florence H., alleging a collision on the high seas, for which the libel claimed damages. The stipulation upon which the suggestion of record was heard stated that the Florence H. up to August 3, 1917, was under construction at one of the private shipyards of the United States. On that day the United States Shipping Board Emergency Fleet Corporation, under the Urgent Deficiency Act of June 15, 1917 (40 Stat. 182, c. 29), requisitioned the Florence H. for national purposes connected with the war and took title by executive order of the President under powers conferred on him by that act. After her completion, the Florence H. was delivered by the Fleet Corporation to the United States Shipping Board, a governmental agency of the United States, and was registered in the name of the United States by the Shipping Board on the 19th day of November, 1917. Subsequently the board chartered the Florence H. to the French government for one round trip voyage from the United States to France. The charter was a demise, and she was manned by a French crew and carried a cargo of food for the French government. Returning from France in ballast, and while still in the possession and control of her French crew, she came into collision with the British steamer Mirlo, owned by the libelants. On her arrival in New York the French government redelivered her to the Shipping Board, which in turn redelivered her to the United States Shipping Board Emergency Fleet Corporation under a charter which likewise constituted a demise. After this delivery she was berthed in the port of New York for a cargo belonging to the French government, which was to be transported from that port to France on behalf of the French government. She remained, however, still in the possession of the Fleet Corporation under the aforesaid charter. The Fleet Corporation was organized under the laws of the District of Columbia in pursuance of section 11 of the Shipping Act, passed September 7, 1916 (Act Sept. 7, 1916, c. 451, 39 Stat. 728 [Comp. St. 1916, §§ 8146a–8146r]). All the stock is held by the United States Shipping Board, except one share each held by the six trustees of the Shipping Board by virtue of their title.

In accordance with the prayer of the libel, process was issued from the District Court to the marshal for the Southern district of New York, who, in pursuance of the said process, arrested the steamship Florence H. and put

his custodian in charge of her, and hereafter, at the request of the United States Shipping Board Emergency Fleet Corporation, the custodian was withdrawn in consideration of a letter by the counsel for the United States Shipping Board Emergency Fleet Corporation, agreeing to give a bond to cover the claim of the libelant in the event that the court should sustain jurisdiction against the Florence H. The case in its present aspect, therefore, is to be dealt with upon the assumption that the marshal is now in actual custody of the ship. The United States Shipping Board and the Emergency Fleet Corporation appear by admiralty counsel and suggest upon the record that the ship may not be subject to arrest as in ordinary civil cases. The district attorney for the Southern district of New York likewise appears specially on behalf of the United States and objects to the jurisdiction of the court. Mr. James K. Symmers appears as amicus curiæ on behalf of the French government.

John M. Woolsey, of New York City, for libelants.

Francis G. Caffey, U. S. Atty., of New York City, appearing specially by John Hunter to object to the jurisdiction.

Alfred Huger, of Charleston, S. C., and Henry H. Little, of Norfolk, Va., for U. S. Shipping Board and U. S. Shipping Board Emergency Fleet Corp.

James K. Symmers, of New York City, as amicus curiæ, appearing on behalf of the republic of France.

LEARNED HAND, District Judge (after stating the facts as above). The question raised is of the propriety of the arrest attempted by the marshal in accordance with the prayer of the libel. It depends, first, upon the immunity of the ship from any arrest because of her ownership and possession; second, upon the existence of any lien arising from the collision at a time when she was in possession of the French republic under charter from the United States, assuming, of course, the truth of the facts alleged in the libel upon which the lien depended.

[1] I may assume that a vessel owned by the United States and in its possession is immune from any process of court. The Parlement Belge, L. R. 5 P. D. 197; Briggs v. A Light Boat, 11 Allen (Mass.) 157. The Exchange, 7 Cranch, 117, 3 L. Ed. 287, was, it is true, the case of a ship of war, and the decision can hardly be thought to go further; yet it is significant that Lord Esher in The Parlement Belge, supra, used it as a basis for his conclusion that a ship used for any "national public purpose" is within the immunity of the sovereign. In so far as The Charkieh, L. R. 4 Ad. & Ec. 59, has anything to the contrary, it must be thought overruled. Assuming the Florence H. to have been so immune while in the possession of the United States, yet in salvage cases it is certainly established that, where property of the sovereign is in the possession of an individual other than an officer of the sovereign, whose custody is only official, it is not exempt from process. The Davis, 10 Wall. 15, 19 L. Ed. 875; The Tampico (D. C.) 16 Fed. 491, 501; The Johnson Lighterage Cases (D. C.) 231 Fed. 365. Indeed, in certain cases the rule has been pressed further than this. U. S. v. Judge Peters, 5 Cranch, 115, 3 L. Ed. 53; U. S. v. Lee, 106 U. S. 196, 1 Sup. Ct. 240, 27 L. Ed. 171. In each of these cases it is difficult to see that the possession of the defendant was other than

mere official custody, and yet process went (and that, too, in suits not in salvage) against the sovereign's property. Nor does it seem to me that the character of the suit can in any sense determine the question here at bar, which is only whether the sovereign's property may be subjected in invitum to the results of a contentious proceeding. It can make no difference whether the question is an implied contract arising from the salvage of the property or the existence of a lien from its tortious management. The question is whether the sovereign can be subjected to the necessity of defending his property from private claims to whose propriety he does not assent.

But, however that may be under general principles of law, the Shipping Act (section 9) removes any question about the liability of such vessels to arrest provided they are "employed solely as merchant vessels." The sentence in question reads as follows:

"Such vessels while employed solely as merchant vessels shall be subject to all laws, regulations, and liabilities governing merchant vessels, whether the United States be interested therein as owner, in whole or in part, or hold any mortgage, lien, or other interest therein."

This provision shows the express purpose that all such vessels shall form part of the mercantile marine of the country, and the question revolves itself only into whether the vessel in question at the time of the arrest was "employed solely as a merchant vessel." As to this the stipulation is somewhat barren of detail, but it does appear that she was about to take a cargo on board belonging to the French government and to be transported to France on its behalf. I do not apprehend that the mere ownership of the cargo made the employment of the vessel other than that of the usual "merchant vessel." It of course may be, and indeed is likely to be, the fact that the cargo was carried in fulfillment of national engagements between the two powers. Moreover, under the modern practice of war it would be extremely difficult to undertake any line of limitation between what was a part of the military operations of a government and any ordinary mercantile activities. It may, indeed, be the fact here, for example, that the cargo owned by the French government was being laden in a vessel of the United States as a part of the allied military operations of the two, and that the vessel could hardly, therefore, be treated as though it were employed solely as a merchant vessel. Yet the point is not pressed, or even suggested, and the stipulation contains nothing of the sort. The arrangements between the Fleet Corporation and the French government, for all that appears in the stipulation, may have been no other than the carriage of freight for hire, a transaction in which the Fleet Corporation was intended to engage, and in which, in the absence of suggestion to the contrary, I must, I think, assume it did normally engage. It therefore seems to me that under the statute, regardless of the common law, the Florence H. was subject to arrest like any other merchant vessel.

[2, 3] The remaining question is whether a lien of collision arose against the ship at a time when she was in the possession of the French republic and in charge of a French crew. This, it seems to me, is concluded by The Siren, 7 Wall. 152, 19 L. Ed. 129. The collision

there occurred after capture of a prize, but before condemnation, and it was held that a lien arose in accordance with general principles of admiralty law, regardless of the fact that the United States had both title and possession. It is true that the jurisdiction of the court was there held to depend upon the fact that the United States had had recourse to its own courts for condemnation, sale, and distribution of the prize money, but the origin of the lien by necessity antedated any such recourse. As a lien in rem, if it arose at all, it arose at the time of the collision, and that did not depend in any sense upon the consent of the United States. While it may be urged that at the time of the collision the title was not in the United States, yet by the subsequent condemnation the title so acquired related back to the time of the capture. At least it was so assumed and agreed in the Manila Prize Cases, 188 U. S. 254, 263, 23 Sup. Ct. 415, 47 L. Ed. 463, and such is undoubtedly the law. If so, The Siren, supra, must be taken as necessarily deciding that a lien of collision arises against a vessel when the title and possession are in the United States; and this was the express ground of the opinion.

But it is said that though a lien of collision may arise against a vessel owned by the United States, this cannot result from the negligence of agents of the United States, to say nothing of agents of the French republic, without violating the rule that a sovereign is not liable for the wrongful acts of its agents. So far as touches the liability of a vessel of the United States for tortious acts of its agents, the opposite of this contention was in effect settled by The Siren, supra, which cannot otherwise stand. The same principle applies to The Athol, 1 Wm. Rob. 374. In both cases the ships of the sovereign were held in rem for collision due to the negligence of their crews. Furthermore, the decision in Workman v. New York, 179 U. S. 552, 566, 567, 568, 21 Sup. Ct. 212, 45 L. Ed. 314, put an end to any doubt that in admiralty at least the doctrine did not apply. It is of course, true that that case involved, not a sovereign, but a municipal corporation, and there might a priori be ground for a distinction between such a party and a sovereign; but the court did not make any such. The opinion, on the contrary, went on the theory that in the admiralty the general rule, respondeat superior, applied without exception. Mr. Justice White arguendo referred to The Siren, supra, and The Athol, supra, in confirmation of the general applicability of the rule, which could not have been if he had supposed that there was a distinction between corporations, sovereign and municipal.

While this doctrine does not, strictly speaking, reach the case at bar, where the collision occurred through the supposedly wrongful acts of agents of a foreign power, the principle does, upon which it depends, nevertheless, because it is settled in the admiralty that the ship is liable for the tortious acts of any one who lawfully comes in possession of her, and directs her navigation, be he charterer, agent, or crew. The Barnstable, 181 U. S. 467, 21 Sup. Ct. 684, 45 L. Ed. 954. If the Florence H. would have been liable under general principles of maritime law for the negligence of an American crew, it can scarcely be supposed that she should not be equally liable for negli-

gence of the crew of any charterer to whom the United States chose to deliver her.

[4] Mr. Symmers suggests that in any event the libel requires a scrutiny of the conduct of the French crew, acting at the time directly under the authority of the French republic, and for that reason no court of a foreign nation may properly undertake it. The principle which he invokes rests upon the observation, which is, indeed, strictly speaking, only a truism, that, under modern conceptions of territorial sovereignty the act of the sovereign cannot be illegal within its own borders. American Banana Co. v. United Fruit Co., 213 U. S. 347, 29 Sup. Ct. 511, 53 L. Ed. 826, 16 Ann. Cas. 1047. To this one should add the corollary that, for obvious reasons of a diplomatic sort, no foreign court will undertake to determine whether the conduct of duly appointed officers of that power is within the scope of their delegated authority, viewed as a question of the foreign municipal law. Either the conduct of the officials is authorized, in which case it has the only warrant of law possible, or it is unauthorized, in which case it rests upon the foreign power first to repudiate it, and so to open the question of the effect of acts thereupon conceded to have been without warrant of law.

None of these considerations is, however, in the least applicable to the conduct of the agents of a foreign power on the high seas and under the national flag of the sovereign to which the court owes allegiance. By no hypothesis may the conduct of the French crew be determined under the law of the French republic, which had no sovereignty over the locus in quo. Whether the acts of its agents were wrongful or not must depend either upon the law of the United States, or upon the jus gentium, if there be any such. There can be no embarrassment juristically in undertaking a judgment upon them.

[5] That there may be embarrassment diplomatically, as Mr. Symmers also suggests, is of course possible; but such considerations are not justiciable by courts. A suggestion from the Secretary of State would be one thing, since he is charged with the responsibility for our relations with other powers. But a court, which is not authorized to treat in any fashion with foreign powers, should be in consequence quite inaccessible to any suggestion which is based upon international considerations. I am aware that it has in some cases been said that, before assuming jurisdiction of causes involving aliens, the court may use its discretion. Whatever may be the grounds which may in any case control that discretion, it appears to me plain that they should not include the possible diplomatic adjustments which a decree might make necessary. If the cause is to be stayed for such reasons, the most obvious proprieties demand that the suggestion shall arise from the only source to which the court has any right to look.

An order may be taken, overruling the suggestions of record of the United States, the United States Shipping Board, and the Fleet Corporation, and allowing the cause to proceed.