## THE LAKE MONROE.

(District Court, D. Massachusetts. November 29, 1918.)*

### No. 1666.

SHIPPING ☞3½, New, vol. 8A Key-No. Series—SUITS FOR DAMAGES—VESSELS SUBJECT TO PROCESS—GOVERNMENT VESSELS.

The provision of Shipping Board Act, § 9 (Comp. St. § 8145a), that vessels acquired by such board and registered as vessels of the United States, "while employed solely as merchant vessels shall be subject to all laws, regulations and liabilities governing merchant vessels," whether the United States be interested therein as owner or otherwise, applies to vessels requisitioned and operated by the Emergency Fleet Corporation, under Act June 15, 1917, § 1 (Comp. St. § 3115$^1$/$_{16}$d), and such a vessel is subject to arrest in a suit for collision.

In Admiralty. Suit for collision by John J. Matheson and others against the steamship Lake Monroe. On motion for process. Granted.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant.

Thomas J. Boynton and Lewis Goldberg, both of Boston, Mass., specially, for the United States.

MORTON, District Judge. Before the United States entered the war, the act of September 7, 1916, was passed, which established the United States Shipping Board and authorized it to construct, charter, and operate commercial vessels, and to form, if advisable, subsidiary corporations to carry out its powers. U. S. Compiled Statutes, § 8146a et seq. Under this statute (section 11) the Emergency Fleet Corporation was organized under the laws of the District of Columbia. After this country became a belligerent, the act of June 15, 1917, was passed (U. S. Compiled Statutes, § 3115$^1$/$_{16}$d), which conferred upon the President extraordinary powers in reference to shipping, and inter alia authorized him to requisition uncompleted vessels and to complete them. By a proclamation dated July 11, 1917, the President delegated to the Emergency Fleet Corporation his powers under the act last referred to, so far as they related to the construction of vessels, and to the United States Shipping Board his powers (speaking very generally) in respect to the operation of vessels.

At the time when this proclamation was made the Lake Monroe was in process of construction for private parties. She was requisitioned by the Emergency Fleet Corporation and completed by it. Upon her completion she was delivered to the United States Shipping Board to be operated by it. The Shipping Board caused her to be registered in the name of the United States, and afterward caused her to be operated through the Emergency Fleet Corporation. This corporation employed the Kerr Steamship Company, or Randall & Co., as its agents to attend to the business details of said operation. The Ship-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Affirmed on prohibition proceedings, 249 U. S. 246, 39 Sup. Ct. 460, 63 L. Ed. —.

ping Control Committee, one of the administrative bodies of the United States Shipping Board, ordered the Lake Monroe into the coal trade for New England. She carried coal from Lambert's Point, Va., to New England ports, under agreements whereby the shippers paid a stipulated rate per ton for the transportation.

While she was so engaged, she collided with and damaged (as is alleged) the fishing schooner Helena. The master of the Helena thereupon filed a libel in this court and prayed for a warrant of arrest against the Lake Monroe. The United States attorney suggested to the court that the Lake Monroe was a government vessel and was exempt from arrest. There was a hearing on the prayer for process in the libel; and counsel for the Shipping Board were heard in opposition thereto.

I have no doubt that the Lake Monroe is a government vessel, and as such would be exempt from arrest, except for the provisions of section 9 of the Shipping Board Act (U. S. Compiled Statutes 1916, § 8146e). The Broadmayne, 85 L. J. R. Prob. Ad. & Div. 153 (1916); The Scotia, 1 A. C. 501 (1903).

The case therefore turns on the provisions of section 9, supra. This section explicitly says that vessels of the Shipping Board may be registered as vessels of the United States and shall be entitled to the benefits and privileges appertaining to such registry. It further provides that:

"Such vessels while employed solely as merchant vessels shall be subject to all laws, regulations and liabilities governing merchant vessels whether the United States be interested therein as owner in whole or in part, or hold any mortgage, lien or other interest therein."

The expression "all liabilities governing merchant vessels" is plainly broad enough to include arrest on process in rem. It seems clear that, as to vessels acquired by the Shipping Board under the act of 1916, the liability here asserted by the libelant exists.

The ultimate question then is whether vessels acquired under the act of 1917 and the presidential proclamation in pursuance thereof stand differently in this particular from vessels acquired under the act of 1916. The parties agree that vessels acquired under the earlier act are used on the same sort of work as vessels acquired under the later one, and that the distinction suggested is not recognized in actual operation. It seems to me that the President, in delegating his powers under the act of 1917 to the bodies organized and existing under the previous act, intended that the ships requisitioned under the later act should be added to those operated or controlled under the former one, and that there should be a single fleet of government controlled vessels, operated by the same instrumentalities and subject to the same liabilities, and I have no doubt that he had power so to deal with the matter.

Moreover, the question presented in this case has already been decided in the Southern district of New York in favor of the right to arrest. The Florence H. (D. C.) 248 Fed. 1012. It would be extremely unfortunate to have a divergence of opinion between the two districts on a question of this character.

Prayer for warrant granted.