THE McALLISTER NO. 85.

THE J. P. McALLISTER.

THE AEOLUS.

LEHIGH VALLEY R. CO. v. McALLISTER LIGHTERAGE LINE, Inc., et al.

McALLISTER LIGHTERAGE LINE, Inc., v. UNITED STATES.

District Court, S. D. New York.

April 5, 1921.

Opinion After Retrial June 22, 1925.

Harrington, Bigham & Englar, of New York City (Leonard J. Matteson, of New York City, of counsel), for libelant Lehigh Valley R. Co.

Burlingham, Veeder, Masten & Fearey, of New York City (Van Vechten Veeder, Chauncey I. Clark, and George A. Morse, all of New York City, of counsel), for McAllister Lighterage Line, Inc., and the J. P. McAllister.

Francis G. Caffey, U. S. Atty., of New York City (John Hunter, of New York City, of counsel), for the United States.

KNOX, District Judge.

On November 17, 1917, the barge, McAllister No. 85, had on board a quantity of steel billets. The barge, having been alongside the steamer Aeolus, was, in being towed therefrom by the tug J. P. McAllister, brought into contact with the steamer's starboard propeller. The latter, being in motion, caused the barge to careen and dump her cargo.

The railroad company, as bailee of the billets, seeks recovery from the tug. Her owners, denying liability, implead and libel the Aeolus, which at the time of the accident was a troop ship in the transport service of the United States. Upon behalf of the Aeolus it is said that she was not at fault; and, in

addition, that, even though fault be found, she cannot, by reason of her sovereign character at the time of the accident, be made to respond. It may be remarked, however, that the Aeolus is no longer in the service of the government, but is being operated as a merchant ship by a private corporation.

The facts· are as follows:

On the day in question the Aeolus lay, bow in, on the north side of Pier No. 1, Hoboken, N. J., her stern about flush with the river end of the pier. She is a twin-screw steamer of some 14,000 tons, and, in length, is 750 feet over all. She was formerly the German passenger ship Grosser Kurfurst, but, having been taken over by the United States, was refitted for use as a transport. She was loaded and about to start upon her first voyage. Before departing, however, it was planned that she should have a dock trial, which was scheduled to begin shortly after the midday meal of November 7.

Shortly before 1 o'clock of that day, the tug, with the barge made fast, stern first, to her port side, arrived at the starboard quarter of the Aeolus; the barge being tied up thereto. It was then thought that the billets were intended for the Aeolus.

When the barge had been made fast, the tug cast off and proceeded into and up the stream, a little off the pier ends. At this point the tug was hailed (by whom is not entirely clear) and told to return to the ship and remove the barge to the south end of Pier No. 1.

Upon starting to comply with this request, the tug's master observed the starboard propeller of the Aeolus to be in motion, and he declined, so he says, to again enter the slip unless the propeller of the Aeolus be stopped.

The tug's version of what then transpired is best shown by quoting the testimony of her master:

"Q. Was the propeller stopped? A. Well, I laid out in the river and waited. I didn't see no ripple on the water, and that showed that the propeller wasn't working, so I went alongside the scow, head on, and laid there still.

"Q. How did you make fast to her? A. I didn't make fast to her. I just threw a line over and laid there still. I asked them a second time if the propeller was stopped, and they said 'Yes.' I said 'All right, let the scow go.'

"Q. Then the lines were let go? A. Yes, sir.

"Q. Then what did you do? A. Started backing her.

"Q. Then what happened? A. I started out and got the scow half way out, and then the ship started working, and then it drew the scow in. * * *

"Q. What happened then? A. It drew her in and hit the scow, and I gave her another pull so that she wouldn't sink alongside the ship."

The captain of the barge testified that shortly after being placed alongside the ship, he called out to the tug:

"'They don't want me here.' Then he stopped and I said 'Ain't you coming in any more?' He said 'No, the propeller is working. If the propeller is working, I won't come in,' and I say 'If the propeller is working, I won't let go my lines.' * * *

"They were hollering for me to let go my lines, and I said I wouldn't do it. I said 'You stop the propeller, and I will let go the lines, and· not before.' So I was on the after end, then, I went forward, and I· was on the after end, so of course I can stand right up on the deck, and then I went forward and I told the captain 'I won't let go before the propeller stops' and he says, 'I won't go in before the propeller stops,' and I went back to the after end—then all of a sudden, somebody on the tug (steamer) hollers that the propeller is stopped, so the tug goes in. * * * The deck hand on the tug gives me a line, and I put it on my middle bitt.

"Q. Was the propeller stopped then? A. Yes, so I sung out to the ship, 'Let go my two lines forward'—my bow was fast on the ship's stern; so they did, and I pulled them in. * * * I went forward again and they was pulling me out and the tug got by (the propellers) and all of a sudden I felt some kind of a suction, because it don't take much to feel it, standing on the boat, so then I heard 'Crack, Crack,' so then I dropped everything and I ran aft, and I got hold of my wife."

The witness says he was sure the propeller had been stopped; otherwise, he would not have let go his lines.

The deck hand of the tug was also sure there was no ripple on the water, either at the time of proceeding to the barge or upon starting to pull it away.

The· testimony is corroborated by Captain Dalton, extra master of the tug, who was on board at the time.

The report made by the tug's master to the steamboat inspectors upon the day succeeding the accident gives some indication of

the persons upon whose advice he acted. It is: " * * * When I started in, ship's wheel was working, and I backed out again. Told clerk of the dock, who gave orders that I would not take the scow out unless wheel was stopped. I waited out in the stream, and it looked to me that the wheel was stopped because I could not see any quick water, and started in to pull scow out. I asked the longshoreman who was throwing the lines off scow if the wheel had been ordered to stop, and was told that the wheel was stopped and to take the scow out. When I started out with the scow I noticed the quick water again, which drew the scow in close to the ship, causing the wheel to hit scow 85."

In order to place responsibility upon the Aeolus it is necessary to find that the starboard propeller was twice placed in operation; first, just prior to the tug's entry to the slip to remove the barge, and, second, after the lines of the barge were cast off and the tug had started to pull the barge away. Such finding can, I think, be made, but it depends solely upon the evidence offered by the claimant for the tug.

The testimony upon behalf of the Aeolus, so far as what actually took place with regard to the starting and stopping of the propeller, is so confused and contradictory as to be unreliable.

This much, however, is entirely clear, viz., that there was upon the bridge, without proper supervision and control, a chief quartermaster who, at least upon one occasion, and perhaps upon two, so manipulated the bridge telegraph as to indicate to the engine room that the engines were to be put at one-third speed ahead. Upon receiving such direction the engine room acted accordingly. The vessel's smooth log, which is all that is available, indicates that the engines were started at 1:30 o'clock and were stopped four minutes later, and after the propeller blades had struck the barge. I would be inclined to give considerable weight to this entry were it not for the fact that none of the officers and crew of the Aeolus have a very clear idea as to just what did happen, and the vessel's rough log is not to be found. No executive officer knew that the propeller was revolving at all until an unknown civilian approached Lieutenant Wiebe, officer of the deck, and, for the purpose of removing the barge, requested that the engines be stopped. Thereupon Wiebe sent a messenger to notify the engine room to immediately stop the engines, and also sent a messenger to the executive of-

ficer for permission to have the engines stopped. Within three or four minutes the messenger dispatched to the engine room returned to Lieutenant Wiebe and reported that he had delivered the order to the engine room.

Wiebe then gave his attention to other matters, and in a moment or two heard the commotion arising from the propeller striking the barge. He had in the meanwhile given no instructions to any one that the propeller had actually been stopped.

Going back to the messenger sent to the ship's executive officer, it appears that the latter also sent to the engine room a message similar to that of Wiebe. Persons in the engine room testify that no messenger arrived there until after they had felt the impact from striking the barge, and that the engines were started and stopped but once. It is not worth while, I believe, to attempt to speculate either upon the possibilities or probabilities. It is enough to say that, once a theory be evolved upon the testimony of one of the ship's witnesses, it is, upon reading the evidence of another, rendered altogether untenable.

I have concluded, therefore, to rely very largely upon the testimony of the barge captain, who, as I noted at the trial, was an intelligent and apparently unbiased witness. He said that he received word from an officer in uniform, as well as from the unknown civilian, that the engines had been stopped, and that thereupon he directed the lines of the barge to be cast off from the ship. So far as appears, however, the barge captain did not communicate this information to the master of the tug. The latter relied, as has been said, upon the "longshoreman who was throwing the lines off the scow." At no time did the tug put herself into communication with a responsible officer on board the Aeolus. The master knew of the presence of danger, and, in order to be wholly relieved from responsibility for injuries arising from a continuance or a recurrence of such danger, he should have asked for, and been assured of, protection from one competent to afford it.

But beyond this, I believe the tug to have been at fault. She had in tow a heavily laden barge which drew enough water to cause her to strike the propeller if towed over it. The barge was moored only 60 to 80 feet forward of the propeller, and the tide was ebb. The tug attempted to remove her tow by means of a single line attached to the middle bitts of the barge's bow. To do this involved the hazard of striking the pro-

peller, even though the latter was not in motion. I mean that, at best, the barge would have a tendency to set down the stream and go over the propeller. By reason of this I feel justified in saying that, while the motion of the propeller doubtless accentuated the damage, it was not the sole cause thereof.

There was plenty of open water in the slip to enable the tug to go alongside the barge and so handle her as to avoid all possibility of danger. This she did not do, and I think that as between the tug and the Aeolus (if the latter is liable at all) they should equally respond.

As I comprehend the understanding had between the proctors for the respective parties, when all of them were last before me, the validity of the process issued herein is not now in issue.

The government, however, does raise the question as to whether the tort, having occurred while the Aeolus was in unquestioned public service, is now chargeable to her. The question has been before the court upon a number of occasions and has uniformly been resolved against the contention of the government. The Florence H (D. C.) 248 F. 1012; The Gloria (D. C.) 267 F. 929.

A decree in favor of the railroad company for full damages and in favor of the J. P. McAllister for half damages may be submitted.

### After Retrial.

■ The above-entitled cases come before the court under the provisions and authority contained in Private Act No. 170, approved February 16, 1925 (c. 248, 43 Stat. 1569), entitled "An Act for the relief of Lehigh Valley Railroad Company and McAllister Lighterage Line (Incorporated)." The act was passed to afford a remedy to the corporations for damages which were heretofore found to have been suffered by them through a maritime tort committed by the steamer Aeolus, on November 17, 1917, then in use as a troop ship in the transport service of the United States. Subsequent to my fixation of liability as a result of the accident, the Supreme Court rendered its decision in The Western Maid, 257 U. S. 419, 42 S. Ct. 159, 66 L. Ed. 299. The question of the liability of the Aeolus, and of the United States as its owner, pro hac vice, came squarely within the authority of that case. As a result, Lehigh Valley Railroad Company and McAllister Lighterage Line, Inc., were left remediless. The matter being called to the attention of the Congress, the Private Act No. 170 was enacted for their relief.

The case has now been retried. The record is precisely the same as upon the former trial, and, upon the facts of the case, there is no reason for me to reach a conclusion differing from the one heretofore expressed in my opinion of April 5, 1921. What is there said with respect to the accident upon which the suits arose, and the right of libelants to favorable decrees, may be considered as reaffirmed. Under the authority of the remedial act, they may now have decrees for full and half damages respectively.