## THE ROSERIC.

(District Court, D. New Jersey. November 22, 1918.)

1. INTERNATIONAL LAW ⬤⟲10—ACTS OF SOVEREIGNTY OF FOREIGN NATION—RECOGNITION BY UNITED STATES COURTS.

An admiralty court of the United States will not exercise its jurisdiction in rem over a vessel under requisition by the British government, and used by it for purposes of the war in which such government and the United States are cobelligerents against a common enemy, so long as the vessel remains in such service, and the fact that its officers and crew are still in the employment of the owner is immaterial.

2. ADMIRALTY ⬤⟲43—ARREST—IMMUNITY—VESSELS IN PUBLIC SERVICE.

A vessel engaged exclusively in public service is as exempt from delay caused by arrest as from final condemnation.

⬤⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. ADMIRALTY ☞43—JURISDICTION—PROCESS—EXEMPTION—SHIPS IN PUBLIC SERVICE.

Unarmed vessel employed by a sovereign in public service is as exempt from judicial process to enforce private claims as one of his battleships.

4. COURTS ☞1—JURISDICTION—SOVEREIGN.

No jurisdiction will be exercised over a sovereign, whether local or foreign, or over instrumentalities employed by it in the public service, by any proceedings in invitum, regardless of the form or character of the process.

5. ADMIRALTY ☞43—SHIP IN PUBLIC SERVICE—REQUISITIONED SHIP.

Where ship and its equipment was requisitioned into public service, and the officers and crew continued to operate ship, the ship and its officers and crew for the time being became the sovereign's instrumentalities, and the ship was as much in possession of the sovereign as if he had taken it over by a regular charter or manned it for his navy.

6. PROCESS ☞115—IMMUNITY FROM PROCESS—PUBLIC SERVICE.

The immunity of the sovereign's instrumentalities devoted to public service from process of its own courts is not based upon the idea that it may be safely accorded, but on account of its dignity and independence, and because it is necessary for the well-being of the nation that it shall not be hampered or interfered with in the use of such instrumentalities.

7. INTERNATIONAL LAW ☞10—IMMUNITY FROM PROCESS—SHIPS IN SERVICE OF FOREIGN COUNTRY.

The immunity from process granted to ship in public service of country by courts of another country is based upon the idea that sovereigns are of equal dignity and independence, and that out of regard for the right of a sovereign to be unhampered in use of such instrumentalities, and to maintain amicable relation between sovereigns, it is tacitly agreed that one sovereign should decline to exercise some of its prerogatives when it would necessarily place another sovereign in a subordinate position.

8. PROCESS ☞115—EXEMPTION—INSTRUMENTALITIES IN PUBLIC SERVICE.

It is not the ownership or exclusive possession of the instrumentality by the sovereign, but its appropriation and devotion to public service, that exempts it from judicial process.

9. ADMIRALTY ☞72—IMMUNITY OF VESSEL IN SERVICE OF FOREIGN GOVERNMENT—PRESENTATION OF CLAIM.

While a claim of immunity of a vessel in the service of a foreign government from arrest under process from a court of the United States may properly be presented by the Department of Justice, the court may, in its discretion, act on suggestion of the Embassy of the foreign government.

In Admiralty. Suit by the McAllister Lighterage Line, Incorporated, against the British steamship Roseric. On suggestion that writ of arrest be quashed, or suit stayed. Suit stayed.

Vredenburgh, Wall & Carey, of Jersey City, N. J., and Burlingham, Veeder, Masten & Fearey, of New York City, for libelant.

Frederick R. Coudert and Howard Thayer Kingsbury, both of New York City, as amici curiæ, for British Embassy.

John M. Woolsey, of New York City, appearing specially for the Roseric.

RELLSTAB, District Judge. [1] The libel alleges that on April 16, 1918, the steamship Roseric negligently collided with libelant's barge McAllister Bros. No. 63, in New York Harbor, to its damage. After seizure by the marshal, within the territorial jurisdiction of this court, the steamship was released by the order of libelant upon an undertaking by the owners to bond her, in case the court should hold that she

was not immune from process, on grounds to be urged on behalf of the British Ambassador. Thereupon counsel for the British Embassy, appearing by leave of court as amici curiæ, filed a suggestion in the following terms:

"(1) The said Roseric is in the service of the British government as an admiralty transport by virtue of a requisition from the Lords Commissioners of the Admiralty and is engaged in the business of the British government and under its direction and control.

"(2) Any interruption of the voyage of said vessel by arrest or other process will interfere with the government business upon which said vessel is engaged, and thereby with the efficient prosecution of the present war.

"(3) This court should not exercise jurisdiction over a vessel in the service of a cobelligerent foreign government.

"(4) The British courts have refused to exercise jurisdiction over vessels in government service, whether of the British government or of allied governments, and by comity the courts of the United States should, in like manner, decline to exercise jurisdiction over vessels in the service of the British government.

"(5) The questions involved in this cause are of great importance to the British government, by reason of the large number of vessels in the service of the British government which enter ports of the United States, and of the important relation borne by the government service performed by these vessels to the efficient prosecution of the present war.

"And, upon such suggestion, for leave to represent to this honorable court as such amici curiæ that the said writ of arrest should be quashed and dissolved in so far as it runs against the said steamship Roseric, and that all proceedings to arrest or detain the said steamship Roseric under said writ, or otherwise, should be stayed so long as said steamship Roseric remains in the service of the British government as aforesaid."

From this suggestion and the deposition of the ship's master, which was not offered in evidence, but produced for the information of the court, it appears that, while the steamship is owned by a British subject and its navigation in charge of the owner's officers and crew, who receive their compensation from such owner, it, as well as the officers and crew, is under the complete control of the British government, and is engaged in its business as an admiralty transport, carrying such cargo, and going to and from such ports, as that government directs. For the time being it is appropriated by the British government for its public use, and was when the collision occurred and the arrest was made.

On the face of the libel, the libelant, an American citizen, has an inchoate lien on the ship, and this court prima facie jurisdiction to perfect it. If the arrest is set aside and the writ quashed, the libelant has no present remedy but in the British courts. If the proceedings to arrest the ship are stayed for as long as it remains in the service of the British government, the libelant's rights will be seriously prejudiced, and in the end it may find itself remediless.

[2] On the other hand, if the right to arrest this ship, so requisitioned, is sustained, the sovereign rights of the British government, at a time when it is engaged in a war, will be subordinated to those of a private claimant. Furthermore, the right to seize one ship so requisitioned means the right to seize any number of ships similarly conditioned, with the result that during the continuance of the war, not only that government, but the United States and other sovereignties, cobelligerents in

prosecuting such war against the common enemy, will be seriously hampered in their joint struggle to maintain their sovereign rights. It is of no moment that in this case, by arrangement between the proctors of the libelant and the ship's owner, no prejudicial detention of the ship resulted. The right to arrest involves the right to detain; detention includes the probability of loss to the users of the vessel; and exemption from delay of a vessel engaged exclusively in the public service of a nation is as much the privilege of sovereignty as the vessel's exemption from final condemnation. For present purposes the steamship must be regarded as still subject to or threatened with process of arrest. The Florence H. (D. C.) 248 Fed. 1012.

Libelant asserts that, "if this court drops or stays its jurisdiction, that must be done for reasons which our courts have declared to be not well founded," and that to grant such immunity would go "far beyond the principles which have been laid down by our courts as determining whether a ship shall be immune from process."

In The Exchange, 11 U. S. (7 Cranch) 116, 3 L. Ed. 287, a pioneer in this field of judicial inquiry, it was held that—

"A public vessel of war of a foreign sovereign at peace with the United States, coming into our ports, and demeaning herself in a friendly manner, is exempt from the jurisdiction of the country."

In that case libelant, an American citizen, asserted title to a vessel found within the waters of the United States and in the possession of the French government, which had converted it into a war vessel. Chief Justice Marshall, speaking for the court, after premising that all sovereignties possess equal rights and equal independence, declared that, as a result of mutual intercourse, impelled by a common interest, they "have consented to a relaxation in practice, in cases under certain peculiar circumstances, of that absolute and complete jurisdiction within their respective territories which sovereignty confers," and that such jurisdiction "would not seem to contemplate foreign sovereigns, nor their sovereign rights, as its objects."

After dealing with the admitted exemptions of the person of a sovereign, his ambassadors, and the passage of his armies under certain circumstances, from interference by the sovereign of the territory into which they had been permitted to enter, the learned Chief Justice said:

"That all exemptions from territorial jurisdiction must be derived from the consent of the sovereign of the territory; that this consent may be implied or expressed; and that, when implied, its extent must be regulated by the nature of the case, and the views under which the parties, requiring and conceding it, must be supposed to act." 7 Cranch, 143, 3 L. Ed. 287.

After pointing out the difference in the status of a private individual and a merchant ship, on the one hand, and a public armed ship, on the other hand, of one nation coming into the territory of another, with reference to amenability to the latter's jurisdiction, and that the foreign sovereign could have no motive for the former's exemption from such jurisdiction, he, referring to the foreign sovereign's attitude to the public armed ship, said:

"She constitutes a part of the military force of her nation; acts under the immediate and direct command of the sovereign; is employed by him in na-

tional objects. He has many and powerful motives for preventing those objects from being defeated by the interference of a foreign state. Such interference cannot take place, without affecting his power and his dignity. The implied license, therefore, under which such vessel enters a friendly port, may reasonably be construed, and, it seems to the court, ought to be construed, as containing an exemption from the jurisdiction of the sovereign, within whose territory she claims the rites of hospitality." 7 Cranch, 143, 3 L. Ed. 287.

The Exchange is a strong case, but it has always been accepted as law both here and abroad. There the allegation was that libelants had been wrongfully dispossessed of their vessel by the representatives of a foreign sovereign. The inconvenience or possible injustice that may happen to the libelant in the instant case, if the Roseric is held immune from arrest, is incomparable with that apparently sustained by the libelant in the cited case.

The immunity there accorded was not due to a lack of judicial power. The power was assumed, but its exercise was waived out of a due regard for the dignity and independence of a sister sovereignty, with whom this nation was at peace. The implication is that to insist upon jurisdiction in such instances likely would be considered by the foreign sovereign as a reflection upon its dignity and an interference with its independence, and would tend to strain and possibly disrupt amicable relationships.

[3] Though in The Exchange an armed ship of war was the subject before the court, there is nothing in the reasoning resulting in its exemption from judicial process that limited the immunity of that character of vessels. The privilege was based on the idea that the sovereign's property devoted to state purposes is free and exempt from all judicial process to enforce private claims. Such idea is as cogently applicable to an unarmed vessel employed by the sovereign in the public service as it is to one of his battleships. The exemption declared in that case was considered in The Santissima Trinidad, 20 U. S. (7 Wheat.) 283, 353, 5 L. Ed. 454, and Mr. Justice Story, who sat in The Exchange, in stating the grounds thereof, referred to them as applicable to foreign public ships.

In Briggs et al. v. Lightboats, 93 Mass. (11 Allen) 157, Justice Gray, in answering the contention that these lightboats, though owned by the United States, were not intended for military service, and therefore were subject to judicial process, stated the ground of exemption as follows:

"The immunity from such interference arises, not because they are instruments of war, but because they are instruments of sovereignty, and does not depend on the extent or manner of their actual use at any particular moment, but on the purpose to which they are devoted." Page 165.

In granting immunity to property devoted by a sovereign to public use, neither its ownership nor the particular public use made of it is treated as important in the British courts.

In The Parlement Belge, L. R. 5 P. D. 197, immunity was accorded to an unarmed vessel belonging to a foreign sovereign in the hands of officers commissioned by him and employed in carrying mails, though

it also carried merchandise and passengers for hire.   In that case Brett, L. J., after reviewing the American and other cases, said:

"That as a consequence of the absolute independence of every sovereign authority, and of the international comity which induces every sovereign state to respect the independence of every other sovereign state, each and every one declines to exercise, by means of any of its courts, any of its territorial jurisdiction over the person of any sovereign or ambassador of any other state, or over the public property of any state which is destined to its public use, or over the property of any ambassador, though such sovereign, ambassador, or property be within its territory, and therefore, but for the common agreement, subject to its jurisdiction."   Page 217.

In The Broadmayne, L. R. (C. A. 1916) 64, the immunity was extended to a ship owned by private parties, while under requisition by the British Admiralty, in an action for salvage.   This exemption was granted in spite of the urgings of plaintiff's counsel (being similar to those pressed here):

"That the effect of requisitioning a ship is not to change the ownership, and the ship requisitioned remains the property of the owners, notwithstanding the requisitioning, and that when the use of the ship by the crown ceases the ship is restored to her owners."   Page 70.

Swinfen Eady, L. J., in reply to such insistence, said:

"That is so, but it does not prevent a ship, so long as she remains under requisition, being in the service of the crown, and as such exempt from process of arrest."   Page 70.

In The Messicano, 32 T. L. R. 519, a vessel requisitioned by the Italian government from private owners, and carrying war material for that government, was held to have the same privilege from arrest in a collision case as a ship requisitioned by the British government.

In The Errisos, reported in Lloyd's List, October 24, 1917, pages 5-8, a vessel owned by Greek subjects, and which, by arrangement between the Greek and British governments, had been requisitioned for the use of the British and Italian governments, and was carrying coal for the latter, was held free from arrest or detention "so long as the ship shall remain in the service of either the Italian or the British government for public or state purposes."

[4] These cases, in my judgment, must be accepted as declaring the judicial policy to exercise no jurisdiction over a sovereign, whether local or foreign, or over instrumentalities employed by it in the public service, by any proceedings in invitum, regardless of the form or character of the process.   The libelant, however, insists that The Johnson Lighterage Co. No. 24 (D. C.) 231 Fed. 365, and The Attualita (C. C. A. 4) 238 Fed. 909, 152 C. C. A. 43, announce a different rule and control the instant case.   The Johnson Lighterage Co. Case (decided by this court) was a proceeding to recover for salvage services.   Both cargo and vessel were seized.   On an order to show cause why such cargo (munitions of war) should not be released from seizure and turned over to the Russian government, who was the owner thereof, it was held that, as the possession of the cargo at the time of its seizure was not in that government, but in the charterer of the vessel, under a contract for transportation, it was within the exception declared in The

Davis, 77 U. S. (10 Wall.) 15, 19 L. Ed. 875, and subject to arrest. The lack of actual possession of the property by the government at the time of seizure is the basis of the exception established by the Davis Case, and distinguishes both it and the Lighterage Case from the case at bar.

The contention of libelant that, as the ship's officers and crew operated the Roseric, she was within the exception established by these cases, is not tenable. The British government, in the exercise of its sovereign powers, took the Roseric and devoted it to its own purposes. That no change in the officers and crew took place, and that they continued in the employment of the ship's owner, is unimportant. The ship, its owner, officers, and crew, were under the compulsion of sovereignty.

While the fact that the operation of the ship was by the owner's officers and crew may be important on the question of the owner's present, and the ship's ultimate, liability for the negligence charged in the libel, it is immaterial upon the question of the right of a private individual to enforce such liability by seizing the ship while it remains appropriated to the sovereign's public use. Whether the government should operate the ship by the owner's officers and crew or others was for the sovereign's exclusive determination.

[5] The effect of its requisition was to put the ship and its equipment into the public service. The officers and crew, as well as the ship, for the time being became the sovereign's instrumentalities, and whatever possession of the ship they obtained by reason of this employment was the sovereign's possession while the requisition was in force.

In legal effect a ship so subjected to vis major is no less in the possession of the sovereign than if he had taken it over by a regular charter or had manned it by his navy. In The Davis, with reference to the goods there in question, the court found:

That the United States was not in the position of a charterer of the vessel, but that "the case was the usual one of a common carrier contracting to deliver goods on his own responsibility," and that "the possession of the master of the vessel was not the possession of the United States. He was in no sense an officer of the government. He was acting for himself, under a contract which placed the property in his possession and exclusive control for the voyage." 10 Wall. 21, 22, 19 L. Ed. 875.

The Attualita (C. C. A. 4) 238 Fed. 909, 152 C. C. A. 43, is more in point. In that case, notwithstanding the ship had been requisitioned by the Italian government and was engaged in its public service, it was held subject to arrest in a proceeding in rem to recover damages for an alleged tort. That case was decided before this country became a cobelligerent with the Italian government in the war against Germany. In all other respects the facts of that case are seemingly identical with those of the case at bar. The District Court had held that the ship was immune from arrest, basing its decision on the ground of international comity. The Circuit Court of Appeals, observing that to allow the immunity would require it to go beyond any of the decided cases, said:

"There are many reasons which suggest the inexpediency and the impolicy of creating a class of vessels for which no one is in any way responsible." 238 Fed. 911, 152 C. C. A. 45.

And, after referring to the immunity granted to the diplomatic representatives and the vessels or other property in the possession and control of a sovereignty, it said that such immunity—

"can be safely accorded, because the limited numbers and the ordinarily responsible character of the diplomats or agents in charge of the property in question and the dignity and honor of the sovereignty in whose services they are, make abuse of such immunity rare." 238 Fed. 911, 152 C. C. A. 45.

That the seizure of the vessel interfered with sovereignty's rights and deprived it of the use of the ship, unless and until it or the owner thereof submitted to the court's jurisdiction (by bonding, etc.), was not referred to.

So far as the suggested irresponsibility of any one for a tort committed in the operation of a vessel so requisitioned is concerned, it should not be overlooked that the owner could be made personally liable for the negligence of his servants in operating the ship, even though the ship should be exempt; and so far as the ship itself is concerned the immunity need not be extended beyond the period of the sovereign's requisition; for, as soon as the sovereign restores the ship to the owner, the reason for its immunity is gone.

[6] It seems to me, and I state my judgment with deference, that the decision in that case unduly subordinates the rights of sovereignty to those of the individual. The immunity of the sovereign's instrumentalities devoted to public service from the process of its own courts, as I understand the previous cases, is not based upon the idea that it may be "safely accorded," but on account of its dignity and independence, and because it is necessary, for the well-being of the nation that it serves, that it shall not be hampered or interfered with in the use of such instrumentalities.

[7] In the case of the courts of one sovereignty waiving jurisdiction over another sovereignty's instrumentalities, the thought of safety to private litigants, to my mind, is at least equally irrelevant. The immunity in such cases, as already noted, is based upon the idea that sovereigns are of equal dignity and independence, and that out of regard for such rights, and to maintain and further amicable relations among them, it is, by tacit agreement, recognized as needful, in certain particulars, that one sovereign should decline to exercise some of its prerogatives when to exercise them would necessarily place another sovereign in a subordinate position.

In line with this thought, the following language of Judge Thompson in The Luigi (D. C.) 230 Fed. 495, is pertinent:

"It is far more important for the courts of the United States to recognize the international rule of comity that an independent sovereign cannot be personally sued, because such a suit would be inconsistent with the independence and equality among the nations of the state which he represents, than it is to take cognizance of private rights, if by so doing that rule is violated." Page 496.

[8] If these ideas dominate the question whether immunity should be granted to a foreign sovereign's property devoted to the public service, it logically follows that it is not the ownership or exclusive possession of the instrumentality by the sovereign, but its appropriation

and devotion to such service, that exempts it from judicial process. That in such use the owner of the instrumentality, through its servants, is permitted to remain in physical possession thereof, and, in consequence, may become personally liable for its agents' torts, is of no moment, where, as in this case, the ship and its entire equipment is under the absolute dominion of the sovereign.

The Florence H. (D. C.) 248 Fed. 1012, is said by analogy to support the libelant's contention in this behalf. The denial of immunity in that case was based solely upon the ground that by congressional action (Act Sept. 7, 1916, c. 451, § 9, 39 Stat. 730 [Comp. St. 1916, § 8146e]) the Florence H., though owned by the United States and devoted to national purposes, because of her employment as a merchant vessel, was made subject to all laws, regulations, and liabilities governing merchant vessels. The ground of the decision negatives the pertinency of the citation.

Thus far I have considered this question as if no relations other than those arising from a state of peace and amity existed between this nation and the one suggesting the immunity. If, then, the consent of one sovereignty to waive jurisdiction over the public instrumentalities of another is implied, when the two live in amity, and in part because their mutual well-being is promoted thereby, as announced in The Exchange, upon what theory is this immunity to be withdrawn from a sovereignty with whom this nation is actively engaged in prosecuting a war against a common enemy? The mutual benefit that accrues from such exemption in time of peace is at best but little in comparison with that which actually accrues in time of such a war.

The extraordinary conditions that environ the present suggestion of immunity, if they did not bring the instant case within the principle here deduced from the cases, would justify the announcing of one that did. However, as indicated, no such judicial declaration is needed. The Roseric is well within such principle, and, unless the British Embassy's *suggestion* is to be disregarded for the reasons now to be considered, must be held immune.

Libelant further contends that the suggestion of the British government is not conclusive, and, if so intended, is not properly before the court, because not presented by the United States attorney. As to the conclusiveness of the suggestion: In The Exchange, supra, the libelant answered the suggestion interposed on behalf of the French government and sought to put it in issue. The Supreme Court, however, accepted the facts as declared in the suggestion. In The Parlement Belge, supra, the court, to a like contention, by Brett, L. J., said:

"The ship has been by the sovereign of Belgium, by the usual means, declared to be in his possession as sovereign, and to be a public vessel of the state. It seems very difficult to say that any court can inquire by contentious testimony whether that declaration is or is not correct. To submit to such an inquiry before the court is to submit to its jurisdiction. It has been held that, if the ship be declared by the sovereign authority by the usual means to be a ship of war, that declaration cannot be inquired into. That was expressly decided under very trying circumstances in the case of The Exchange. Whether the ship is a public ship, used for national purposes, seems to come within the same rule." Pages 219, 220.

In the instant case none of the allegations of the suggestion have been put in issue. It is therefore, so far as this case is concerned, sufficient to say that, if the suggestion has been properly presented, it is conclusive as to all its material statements of fact. To the same effect, see The Luigi, 230 Fed. 495, 496, supra.

[9] As to the source from which the suggestion came: What is to prevent one sovereignty from appearing in the courts of another sovereignty? Or, stated more to the point, why should the court of one sovereignty refrain from receiving a suggestion as to its lack of jurisdiction, because it comes solely from the representative of a foreign sovereignty? It is not merely a proper, but a commendable, practice for such suggestions to come through the Attorney General or one of his representatives; but is it to be disregarded unless it does so come? No case has been cited that holds as matter of law that such a suggestion will not be received from a foreign sovereign's official representative. True, in The Luigi, supra, upon an oral suggestion made in open court—seemingly as amicus curiæ for a foreign government—Judge Thompson said he "was of the opinion that, inasmuch as the suggestion raised a question of international comity, it should come through official channels of the United States government."

In The Florence H., supra, Judge Learned Hand declined to receive the suggestion made on behalf of a foreign sovereign that to assume further jurisdiction might result in diplomatic embarrassment, unless such suggestion came through the diplomatic channels of this government. But I do not understand that either Judge Thompson or Judge Hand denied the power of the court to receive the suggestion through any other channels.

There may be good reasons in a given case why a suggestion from a foreign sovereignty should not be entertained, save through the executive branch of the government, of which the court is a part. To my mind, the sources from which such suggestion will be received is a matter of judicial discretion. Each case must be governed by its own circumstances, and The Luigi and The Florence H. I take to be instances where, in the exercise of judicial discretion, it was thought best not to receive the suggestions made on behalf of foreign governments, unless they came through the executive department of our government, and not as determinations that no such suggestions would be received from any other source.

In the instant case there are no considerations influencing the judicial discretion to refuse to act upon the suggestion made directly to the court by the British Embassy. On the contrary, from what has already been said concerning our national interests as a cobelligerent with the British government in the war pending at the time of the Roseric's seizure, they lead so obviously to an opposite determination that, in the absence of an intimation from the executive branch of this government that the public interests would be disserved by receiving such suggestion, its rejection would not be justified.

The only remaining question is whether, in following the British Embassy's suggestion, the writ of arrest should be quashed, or merely that the suit be stayed. While full immunity is to be accorded the British

government in the use of the Roseric while she is under its requisition, no good reason calls for the dismissal of the suit, a result which would follow the quashing of· the writ.

A decree may be entered, staying all proceedings to arrest or detain the Roseric so long as she continues in the service of the British government.