## THE NAVEMAR.
### No. 401.

Circuit Court of Appeals, Second Circuit.
June 7, 1937.
On Reargument June 24, 1937.

See, also, 18 F.Supp. 153.

Lynch, Hagen & Atkins, of New York City (Charles W. Hagen, Jesse L. Rosenberg, Henry C. Eidenbach, and John S. Bull, all of New York City, of counsel), for appellant Fernando de los Rios, Ambassador of Spain to the United States.

Bigham, Englar, Jones & Houston, of New York City (James W. Ryan and Catesby Jones, both of New York City, of counsel), for libelant-appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

The Compania Espanola de Navegacion Maritima, S. A., is a corporation organized and existing under the laws of Spain. On October 10, 1936, it was the owner and operator of the steamship Navemar which plied between Spain, New York, and ports in South America. On that date, while she was in the port of Buenos Aires, Argentine, a decree was issued by the Spanish government attaching the Navemar and declaring her to be in the service of the Spanish government subject to management by the Ministry of Communication and Merchant Marine. The decree further provided that it was to be in force as a law of that country upon its publication in the "Gaceta de Madrid," which was done October 11, 1936, and that a notation of the attachment should be made on the documents of the vessel and on the Consular Registries. The master of the Navemar received a cablegram from the Spanish authorities October 16, 1936, informing him of the expropriation or attachment of the vessel and directing him to report and place himself at the disposal of the Spanish consul; he did so, but, not having received instructions, sailed on the same day for Rosario, Argentine, where he loaded a cargo of linseed consigned to an American corporation. He deposited the ship's roll with the Spanish consul at Rosario, and was forced to leave without it because of a sudden notice of impending low water. Having returned to Buenos Aires, the vessel was loaded with an additional cargo of linseed and with 2,200 tons of general cargo sent by private shippers to private consignees. The consul at Buenos Aires delivered to the master the ship's registry and roll, which had been forwarded by the consul at Rosario, each of which bore a similar indorsement to the effect that the vessel had become the property of the Spanish government. The indorsement on the registry read:

"By cable dated the 15th of October, 1936, the Spanish Embassy at this Capital, His Excellency, the Minister of the Secretary of State, informs that this vessel passes to be the property of the Spanish Govern-

ment by decree of confiscation published in the Gazete on the date of the 11th of the present month."

The consul at Buenos Aires told the master to continue his voyage since no instructions had been received from the Spanish government, but he was advised to cable the Director of Navigation, whereupon the following message was sent: "Authorized by Consul General we sail for New York Greetings signed Master, 'Navemar.'"

After arrival in New York, November 25, 1936, and discharge of part of the cargo in Brooklyn, the vessel moved to a pier at Edgewater, N. J., on November 30, where the discharging of the cargo was completed December 1, 1936. Freight was earned and was payable to Linea Sud Americana, Inc., time charterer of the Navemar with six months to run on its charter. Garcia & Diaz, as agents of the charterer, collected the freight money prior to delivery to the consignees. Upon arrival in New York, the master deposited the ship's roll with the consul general in New York and called his attention to the indorsement which it bore. After communication with the Spanish ambassador at Washington, the consul delivered to the master a letter dated November 28, 1936, reading: "The ship of your command is from this date at the disposition of the Republic. * * *"

The master was requested to present a detailed account of the expenses of the Navemar.

The master also presented himself at the office of Garcia & Diaz, agents for the appellee, and was ordered to proceed with the discharging of cargo and to prepare for another voyage to Buenos Aires in accordance with the charter.

While the Navemar was at its pier in Edgewater, N. J., December 1, 1936, five members of the crew, representing themselves to be a duly elected committee, claimed authority to take charge of the provisions and pay of the crew. On December 2 the Navemar proceeded to anchorage grounds in Red Hook Flats, Brooklyn, to undergo repairs pursuant to instructions by the appellee. The consul in New York, on December 2, 1936, advanced $300 to the master to care for the expenses of the Navemar. The master reported the activities of the committee to the consul and was told that they met with his approval. December 7, 1936, the consul appointed a new master to relieve the former one of his command. Meanwhile the crew, aided by the committee and instigated by the consul, continued to assert authority over the Navemar, interfering with the making of repairs and seeking to prevent the master from going ashore.

This possessory libel was thereupon filed by the appellee, process being served December 7, 1936, on the vessel and on each of the members of the committee. No general or special appearance was entered by the respondents. On December 14, 1936, hearings having been held, the court entered a default decree holding that the appellee was the owner of the vessel and entitled to its possession. The decree was executed and possession delivered as directed.

The consul, appearing specially on December 16, 1936, made an application to have the final decree vacated and to be permitted to file a suggestion, claiming immunity of the Navemar from jurisdiction, and to intervene in the suit on behalf of the Spanish ambassador. The application was denied, though leave to renew was granted. Thereafter, on January 8, 1937, a supplemental suggestion was filed by the consul appearing on behalf of the ambassador, and a final order was entered February 3, 1937, denying the motion to intervene and to assert the claim of the Spanish government. From this order the ambassador appeals.

In filing the suggestion through the consul as his agent and in seeking to intervene in the suit, the ambassador followed a permissible and adequate procedure distinguishable from that which was held insufficient in The Pesaro, 255 U.S. 216, 41 S.Ct. 308, 309, 65 L.Ed. 592 and Ex parte Muir, 254 U.S. 522, 41 S.Ct. 185, 65 L.Ed. 383. In the Pesaro Case, a direct suggestion of immunity by the Italian ambassador was deemed inadequate, the court pointing out that no intention was revealed by the ambassador "to put himself or the Italian government in the attitude of a suitor." In these circumstances mediation through the official channels of the United States was stated to be a proper method, though it was not held to be an exclusive one. Here the consul, appearing as a duly appointed agent of his government (compare The Anne, 3 Wheat. 435, 4 L.Ed. 428; The Sao Vicente, 260 U.S. 151, 43 S.Ct. 15, 67 L.Ed. 179) filed the suggestion of immunity and the ambassador has asked to intervene specially as a party to the proceedings, seeking, therefore, as a suitor to assert his government's claim to the Navemar. Obviously, this is not merely a "respectful sug-

gestion" inviting the court to give it effect—which was the court's description of the procedure followed in the Pesaro Case.

In the suggestion filed on behalf of the ambassador, it is stated that in accordance with the decree of October 10, 1936, the consul general at Rosario, "pursuant to instructions from the General Director of the Spanish Merchant Marine, took possession of the * * * Navemar in the name of the Republic of Spain * * * whereby * * * the Navemar then and there became and at all times has remained the property of the Government of the Republic of Spain."

It is also alleged that, since no consent has been given by the Spanish government, the Navemar is immune from arrest and from judicial process.

■ Jurisdiction to entertain this suit is challenged because (1) by virtue of article XXIII. of the Treaty between Spain and the United States matters relating to the "internal order of merchant vessels" and to "differences which may arise either at sea or in port between captains, officers and crews" are placed within the cognizance of the consuls of the respective nations; and (2) that the Navemar, being a public vessel of the Spanish government, is immune from judicial process. The first ground may be dismissed with the observation that the issue in this case is one of title or ownership to the Navemar and not the mere settlement or adjustment of internal differences on the vessel. The second objection requires consideration.

The development in this country of the doctrine of immunity of foreign vessels stems from The Exchange v. M' Faddon, 7 Cranch. 116, 3 L.Ed. 287. The question there presented was whether a French war vessel was subject to the jurisdiction of our courts. It was held not to be upon the principle that a ship of a foreign friendly nation which constitutes a part of its military force, which is under the command of the sovereign and which is employed for obviously national purposes, should not be subject in invitum to interference by our courts. That was thought necessary if the sovereignty of a foreign friendly government was to be adequately and fully recognized. Where the vessel is one of war, the elements of possession, and direct operation by the foreign government are combined, and the national or public character of its functions is indisputable. But the notion of a public purpose has been extended and immunity granted, though the vessel is commercially engaged. Berizzi Bros. v. Pesaro, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088; Carlo Poma, 259 F. 369 (C.C.A.2), rev'd on jurisdictional grounds, 255 U.S. 219, 41 S.Ct. 309, 65 L.Ed. 594; The Maipo, 252 F. 627 (D.C.N.Y.). In the Pesaro Case the vessel was owned, possessed, and operated by the Italian government in the carriage of merchandise for hire. The advancement of trade and the acquisition of revenue incident to participation in commercial services was deemed a sufficient public purpose. In England, the trend has been liberal (The Jassy [1906] P. 230; The Porto Alexandre [1920] P. 30), and the entire doctrine of immunity has been influenced by the theory that an action against the foreign vessel is not only in rem but also in personam against the foreign sovereign (The Parlement Belge, 5 P.D. 197). Inability to implead the foreign sovereign is singularly emphasized in The Jupiter (1924) P. 236.

■ One of the first principles recognized in the rudimentary body of international law since the Middle Ages to our day is that a vessel is considered, constructively at least, as part of the territory of the sovereign whose flag it flies and is subject, while on the high seas, or in foreign territorial waters, to the jurisdiction of that sovereign. U. S. v. Rodgers, 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071; The Scotland (National Steam Nav. Co. v. Dyer), 105 U.S. 24, 27, 26 L.Ed. 1001; Wilson v. McNamee, 102 U.S. 572, 574, 26 L.Ed. 234; Crapo v. Kelly, 16 Wall. (83 U.S.) 610, 21 L.Ed. 430; The E. B. Ward, Jr., 17 F. 456 (C.C.La.).

■ If we concede, as we must, that the Spanish government possesses, as an incident to sovereignty, the right, exercisable as to property within its jurisdiction, of appropriating private property to public uses when the exigencies of public welfare demand it (U. S. v. Belmont, 57 S.Ct. 758, 81 L.Ed. ——, decided by the Supreme Court May 3, 1937; Ricaud v. Amer. Metal Co., 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733; Luther v. Sagor [1921] 3 K.B. 532; Wheaton Internatl. Law [6th English Ed.1929] p. 335), then the right to issue its decree of expropriation on October 10, 1936, must be admitted. The Navemar was subject to the governmental decree.

■ The claim of this public control is borne out by the ambassador's suggestion and his desire to intervene. The allegations of the suggestion we are bound to accept as

conclusive. Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726; Ricaud v. Amer. Metal Co., supra; The Adriatic, 258 F. 902 (C.C.A.3). It is not for us to examine the propriety or to determine the validity of the decree affecting property within the foreign sovereign's dominion. If by any misadventure the authorized representative of a foreign state should make an unfounded suggestion, the proper remedy would be through diplomatic channels between the two sovereigns and not by legal proceedings against an independent sovereign or its property.

▪ The modern state has found it necessary—for reasons entirely foreign to judicial inquiry—to widen the range of its operations, and to embrace enterprises essentially nongovernmental in character. The purpose to which a foreign vessel is dedicated may bear upon its immunity from judicial process. Berizzi Bros. Co. v. Pesaro, supra; Briggs v. Light Boat Upper Cedar Point, 11 Allen (Mass.) 157; Hyde, International Law, vol. 1, § 256. Actually, as to a vessel possessed—though constructively—and controlled by a foreign sovereign, the government is left by general public law at liberty to determine for itself what functions are of a governmental and what of a private nature; and the conclusions of the foreign sovereign or state in that regard are outside the scope of judicial determination in the courts of another state. The Adriatic, supra; The Roseric, 254 F. 154 (D.C.N.J.); The Parlement Belge, supra. See, Note, 31 Columbia Law Review, 660, 662.

▪ Having dedicated the vessel to the public service by subjecting it to its control, the Spanish government must be regarded as at least in constructive possession of her which, for purposes of immunity, is as efficacious as actual possession asserted through the government's own officers. The Roseric, supra; The Adriatic, supra; The Jupiter [1924] P. 236; Hyde, supra, § 256; contra, The Attualita, 238 F. 909 (C.C.A. 4); Long v. Tampico, 16 F. 491 (D.C.N.Y.), and see The Carlo Poma, supra; The Beaverton, 273 F. 539 (D.C.N.Y.). Cf. The Johnson Lighterage Co. No. 24, 231 F. 365 (D.C.N.J.); The Davis (U. S. v. Douglas), 10 Wall. 15, 19 L.Ed. 875. That must be so if the basis of the doctrine of immunity, that the instruments of a foreign sovereignty should not be interfered with by judicial process, is to be fully appreciated and recognized.

Moreover, we have here as evidence of possession and control first that, while at Buenos Aires, the master placed himself "at the disposal of the Spanish Consul" pursuant to direct instructions by the Spanish government; second, that the consuls at Buenos Aires and Rosario made indorsements on the ship's registry and roll of which the master was aware and which claimed the Navemar as property of the Spanish government; third, that the master on December 7, 1936, advised the former owners of the vessel that on October 28, 1936, the Spanish government had obtained possession of the Navemar and that since that date he had been "generally under orders of the Spanish Government" as given him by the consul at Buenos Aires; fourth, that on December 2, 1936, the master signed a receipt acknowledging that the Spanish consul in New York had given him $300 as an advance to attend to the expenses of the vessel.

It thus appears that the master and his vessel were acting under "compulsion of the sovereign"—subject to instructions of the Spanish government or of its consular representatives. The Roseric, supra.

In this view of the case, the court below erred in assuming jurisdiction of the libel and in refusing to act on the suggestion of the Spanish ambassador.

Order reversed with directions to enter an order dismissing the libel.

On Application for Reargument.

PER CURIAM.

It is conceded that the S. S. Navemar was under arrest by a process in a libel filed by the Robins Dry Dock & Repair Company against S. S. Navemar, issued December 7, 1936, and returned December 9, 1936, and pending in the District Court for the Eastern District of New York. The record on appeal may be amended so as to read that the Navemar was attached and taken into the custody of the court under such process at the time the possessory libel herein was filed.

Pursuant to the stipulation of counsel, the record will be amended so as to include the exhibit offered at fol. 416, consisting of a power of attorney, dated February 14, 1936, under the signature of Enrique Carlos De La Casa, minister counselor under the seal of the Spanish ambassador; telegram of authority of the Spanish ambassador under date of September 14, 1936, to the attorneys for libelant, and a letter of the

678

Secretary of State of the United States dated March 17, 1936, addressed to His Excellency, the Spanish Ambassador.

The application for reargument is denied.