## THE NAVEMAR.[*]

COMPANIA ESPANOLA DE NAVEGACION MARITIMA, S. A. v. CRESPO et al. (DE LOS RIOS, Spanish Ambassador, Intervener).

### No. 208.

Circuit Court of Appeals, Second Circuit.
March 6, 1939.

[*]For supplemental opinion, see 103 F.2d 783.

Lynch & Hagen, of New York City (Charles W. Hagen, Julius I. Puente, Hen-ry C. Eidenbach, and John S. Bull, all of New York City, of counsel), for Fernando de los Rios, Ambassador of Spain to the United States, intervening petitioner-appellant.

Bigham, Englar, Jones & Houston, of New York City (T. Catesby Jones and James W. Ryan, both of New York City, of counsel), for libellant-appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The libellant, a Spanish corporation, filed a possessory libel against the Steamship Navemar in rem, and against five members of the crew of that vessel in personam, alleging that libellant had been wrongfully deprived of possession of the vessel by those members of her crew. A decree by default was entered on December 14, 1936. The Consul General of Spain in New York sought on behalf of the Spanish Ambassador to open the default and vacate the decree and filed a suggestion alleging that the court had no jurisdiction because the Navemar was the property of the Republic of Spain by virtue of a decree of attachment appropriating the vessel to the public use and was then in the possession of the Spanish Government, and asking that the court direct delivery of her to the Spanish Consul General of New York.

The District Court "allowed a full hearing upon the suggestion and upon reply affidavits submitted by libellant in the course of which there was opportunity for the parties to present proof of all the relevant facts." Compania Espanola v. Navemar, 303 U.S. 68, 72, 58 S.Ct. 432, 434, 82 L.Ed. 667. The court found that the Navemar was never in the possession of the Spanish Government prior to her seizure by the five members of her crew in New York Harbor and likewise that she was not a vessel in the public service of Spain and accordingly denied the petition to intervene. Upon the appeal, we reversed its order and held that the suggestion of the Ambassador was binding on the court and that the evidence had established a possession of the Navemar by the Spanish Government which rendered her immune from seizure in the possessory action. The Navemar, 2 Cir., 90 F.2d 673. The Supreme Court granted a writ of certiorari, reversed the order of this court and affirmed the order and findings of the District Court holding that possession of the Nave-

mar was not in the Spanish Government, but permitted the Ambassador "to intervene for the purpose of asserting the Spanish government's ownership and right to possession of the vessel." The Navemar, 303 U.S. 68, 58 S.Ct. 432, 436, 82 L.Ed. 667.

Thereafter, in conformity with the decision of the Supreme Court, the Spanish Ambassador filed a new intervening petition in which he alleged that by virtue of a decree promulgated by the President of the Republic of Spain, ownership and the right to possession of the Navemar was vested in that Republic. The libellant filed an answer denying the allegations of this petition. The issues thus raised came to trial both upon the evidence taken on the former hearing and upon additional proofs adduced at the new trial.

Justice Stone, in writing for the Supreme Court, thus referred to the findings of the District Court on the first hearing: "The District Court concluded, rightly we think, that the evidence at hand did not support the claim of the suggestion that the Navemar had been in the possession of the Spanish government."

We cannot see that the testimony taken at the second trial was sufficiently different from the former proof to establish possession of the Navemar in the Spanish Republic. If, as the Supreme Court held, that government did not acquire possession of the ship at Buenos Aires, nothing occurred thereafter which changed the situation. The libellant continued to retain possession and paid both the officers and the crew. The only significant evidence tending to show governmental possession which is claimed by the intervenor to be new consists of certain alleged acts and declarations by the master of the Navemar that were either denied by him or contradicted by other declarations and acts on his part. For example, Garcia, one of the crew, testified that the master Martinez called the crew together at Buenos Aires, told them that he had received a cable from the Director General of Navigation at Madrid informing him of the attachment of the Navemar and warned them that he (Martinez) was the legitimate representative of the government and that they would be required to obey his orders or suffer return to Spain for punishment. This was denied by Martinez and the trial judge believed his testimony.

The letter of Martinez to the charterer (Libellant's Exhibits 6 and 7) was in the record at the former trial, likewise the receipt for $300 given by Martinez to the Consul General of Spain in New York to pay Martinez for advances to the crew. In the opinion of this court (The Navemar, 2 Cir., 90 F.2d 673, 677) these documents were referred to as part of the evidence which we thought showed possession on the part of the Spanish Government. The Supreme Court differed with us and agreed with the District Court, and the findings of the District Judge on the new trial are to the effect that these documents did not show possession on the part of the Spanish Government or offset other evidence that Martinez was acting for the owner of the vessel.

The towage receipt (Petitioner's Exhibit B) signed by Martinez as agent for the Consul of Spain was to acknowledge that towage had been furnished by Dalzell Towing Company from Edgewater, New Jersey, to Red Hook Anchorage, New York. Why he signed the receipt in the form adopted is doubtless hard to understand, but he swore that the ship was moved from Edgewater to Red Hook Flats, Brooklyn, under instructions of the owner. The District Court found that this, with all the other evidence, was insufficient to show possession in the Spanish Government.

The further contention is made by the Spanish Ambassador that the interference by the Consul with the making of repairs at New York showed that the Spanish Government was in possession. The trial judge found to the contrary and we are required to adopt the same course in view of the fact that the matter was before the court on the former trial and was discussed by the judge in his opinion in connection with his findings which the Supreme Court affirmed. Moreover, the Supreme Court referred back only the question of title and right to possession for determination at the new trial, and not the question whether the Navemar was immune from judicial process.

The matter to be determined upon this appeal is whether the Spanish Ambassador established title in or right to possession of the ship. We think that he established such title and right to possession and that his intervening petition should, therefore, prevail.

The title and right to possession of the Navemar was transferred to the Spanish

Republic by means of an executive decree dated October 11, 1936, published by that government in the Gaceta de Madrid.

The decree recited that it was issued for the same reasons that caused the expropriation of several ships and their subjugation to the national public service by means of corresponding decrees in accord with the Council of Ministers and at the proposal of the Ministry of Communications and Merchant Marine. These reasons set forth in other similar decrees were the following:

"The vast preparation of the Military Fascist uprising, aimed against the liberties of the Spanish people, which are symbolized in the Republican Regime and in the legitimate government of the popular front, which as the prize of peace was established in our country by the National will, serenely and overwhelmingly expressed through the democratic means of universal suffrage, has been able to attract the aid of capitalists and corporations who, giving preference to the gain of their business with utter disregard of the blood of the Spaniards, did not hesitate in undermining our public treasury by every imaginable means, placing at the service of the traitors monies and wealth which they always kept from the honest, social contribution.

"Among those corporations are the steamship companies who, far from lending their collaboration to the Republic, as is their duty, in the transportation services, so heavily burdened due to the Civil War, are helping the prolongation of this war by aiding in the criminal work of the Fascists with a cleverly disguised and stubbornly maintained attitude.

"The Government cannot permit, under the protection of laws and established international usages which protect the free commerce and traffic of private individuals, that the integrity of the nation be attacked."

The translated copy of the decree relating to the expropriation of the Navemar as submitted by the Spanish Ambassador reads as follows:

"Decree."

"By the same reasons which caused the attachment by the State of several vessels and the destination of these boats to the national public service through the corresponding decrees of attachment, and in accord with the Cabinet of Ministers and at the request of the Minister of Communications and Merchant Marine, I decree the following:

"Art. 1st. The Spanish State attaches the steamship Navemar of the Compania Espanola de Navegacion Maritima, S. A., which will remain as vessel to the service of the State, to be used for its national public service, this vessel will be managed by the Ministry of Communication and Merchant Marine, through the General Bureau of Merchant Marine.

"Art. 2. On the Official Registry of vessels and in the Central Registry of the aforesaid General Bureau, it will be stated this attachment and the consequent change of authority, as well as on the documents of the said vessel and on the corresponding Consular registries.

"Art. 3. Any insurance policies covering the vessel and cargo which have been duly paid will continue in effect up to the date of their maturity and they will be definitely cancelled if they are made with any foreign companies.

"Any new policies of insurance that may be contracted or upon renovation of the existing ones from the date of this decree, will be made with national companies, registered in Spain, according to the rules that may be promulgated by the General Bureau of Merchant Marine.

"Art. 4. The Spanish State takes over all lawful credits and obligations concerning the attached vessel. The final decision of pending claims or any that may arise by consequence of operations or maritime needs of such vessel will fall exclusively under the jurisdiction of the Spanish Courts.

"Art. 5. The Minister of Communications requests that the General Bureau of Merchant Marine will ask of the Ministers of Finance and Justice, the necessary and effective measures to secure with the property of the Compania Espanola de Navegacion Maritima, S. A., or of the individuals who will be determined by their holdings in the Company owner of the seized vessel, the fulfilment of any maritime obligations contracted in relation to this ship prior to the date of this decree.

"Art. 6. It is hereby declared nulled and without any value whatsoever any simulated maritime debts or sales or change of flag, to be made in a foreign country or in the benefit of subjects or foreign companies, by the Company owner of the said

vessel, either in their own name or by their account, as well as any cession or transference of the credits, monies or any other valuables in favor of foreign persons with residence in a foreign country.

"Art. 7. The General Bureau of Merchant Marine is commissioned to propose or resolve, according to the cases, whatever may be necessary in relation to the said vessel, its destination and its legal or international condition.

"Art. 8. The Government will in due time give account of this Decree to the Congress and it will be in force as a Law of the country from the date of its insertion and publication in the 'Gaceta de Madrid.'

"Given in Madrid, the tenth of October of the year nineteen hundred and thirty-six. ·Signed: Manuel Azana,—Minister of Communications and Merchant Marine: Signed: Bernardo Giner de los Rios."

Article 44 of the Spanish Constitution provides that: "The ownership of all types of property may be the object of forceful expropriation in the interest of social welfare by means of an adequate indemnification unless a·law approved· by the absolute majority of the Cortes makes some other disposition. * * * In no case shall it impose the penalty of confiscation of property."

On October 11, 1936, when the Navemar was in the port of Buenos Aires, Argentine, the decree expropriating her to the public service was published in the Gaceta de Madrid and on October 16, 1936, her master Martinez while she was still at that port received a cablegram from the Spanish authorities informing him of the expropriation of the vessel and directing him to report and place himself at the disposal of the Spanish Consul. In our opinion the effect of the decree was to transfer the title and right to possession of the Navemar to the Spanish Government. This seems to follow from the decision of the Supreme Court in Crapo v. Kelly, 16 Wall. 610, 631, 21 L.Ed. 430. There a Massachusetts partnership owned a one-half interest in a vessel (registered in Massachusetts) which was on the high seas, pursuing a voyage from the Pacific to New York. The partnership, being insolvent, made a voluntary petition to a judge of the insolvency court in Massachusetts in order to avail itself of the insolvent laws of that state. The judge, acting under the local statute, appointed one Crapo and others assignees in insolvency and executed and delivered to them an assignment of all the personal property of the insolvent. Under the state statute the assignment operated as a conveyance of all the debtor's property ,"which he could have lawfully sold, assigned or conveyed". Thereafter, and while the ship was still on the high seas, one Robinson, a New York creditor, sued the partnership in a New York court and obtained a warrant of attachment against its property in accordance with the local law. A few days afterwards the ship ar-· rived in port and was attached by the sheriff. · Thereupon the assignees in insolvency intervened in the action and claimed the ship. The question was whether the Massachusetts assignees or the attaching creditor had prior rights. It was held by the New York court that the prior right was with the attaching creditor. On appeal, the Supreme Court (per Hunt, J.) reversed the decision of the New York courts and held that the effect of the Massachusetts statute and the assignment was to vest the ownership of the vessel in the assignees. Justice Hunt said:

"This vessel * * *· was · upon the high seas at the time of the assignment. The status at that time decides the question of jurisdiction. The state of New York had no jurisdiction over her until long afterwards. No conflict can, therefore, arise between the laws of New York and of Massachusetts * * *. We hold that she was subject to the disposition made by the laws of Massachusetts, and that for the purpose and to the extent that title passed to the assignees, the vessel remained a portion of the territory of that state."

The assignees in·insolvency having been found to possess the prior right, the judgment awarding it to the attaching creditor was held by the Supreme Court to be erroneous. It is true that in The Jupiter (1927) P. 122, 144, Mr. Justice Hill remarked that it had not been suggested "that ships were to be governed by any principles other than those applicable to other chattels", but in Compania Naviera Vascongado v. S. S. Cristina, [1938] A.C. 485, 509, Lord Wright treated the question as open in the English courts, saying that: "It must also be noted in the present case that the Cristina, even when in Cardiff docks, may have, as being a foreign merchant ship, a different status from an ordinary chattel on land."

It is to be noted that in Crapo v. Kelly, supra, the assignment was not voluntary but one made by the judge of the insolvency court pursuant to the requirement of the state law. The decision proceeded upon the theory that a Massachusetts vessel though upon the high seas was within the jurisdiction of that Commonwealth and that title to it would be transferred pursuant to judicial decree. Cf. Restatement of Conflict of Laws, § 45; Beale, Conflict of Laws, § 45.2 and § 406.1.

We have seen that in Crapo v. Kelly, 16 Wall. 610, 21 L.Ed. '430, jurisdiction was exercised upon the theory that a ship on the high seas is part of the territory of the sovereign whose flag she flies. Later and more generally accepted reasoning supports jurisdiction upon the theory of personal allegiance rather than of territoriality. As Justice Van Devanter said in Cunard S. S. Co. v. Mellon, 262 U.S. 100, 123, 43 S.Ct. 504, 507, 67 L.Ed. 894, 27 A.L.R. 1306, when dealing with the theory sometimes adopted that a merchant ship is a part of the territory of the country whose flag she flies: "But this * * * is a figure of speech, a metaphor. * * * The jurisdiction which it is intended to describe arises out of the nationality of the ship, as established by her domicile, registry and use of the flag, and partakes more of the characteristics of personal than of territorial sovereignty. * * * It is chiefly applicable to ships on the high seas, where there is no territorial sovereign; and as respects ships in foreign territorial waters it has little application beyond what is affirmatively or tacitly permitted by the local sovereign."

Sir William Holdsworth, writing in Volume 35 of the Law Quarterly Review, at page 25, says that the power of requisitioning ships long exercised by the British Government is justified "by the doctrine that ships and shipowners alike owed allegiance to the Crown, wherever they were."

It is not necessary to say that the decree effected an expropriation of the vessel while she was in foreign territorial waters at Buenos Aires, though it was promulgated and notification thereof was given to the master when the ship was at that port. Even if the decree might not be effective while the Navemar was at Buenos Aires, nevertheless it was an instrumentality of expropriation that would become operative upon the vessel as soon as she reached the high seas.

It is argued that we should not enforce a right of ownership created by the decree, since the right was created as a method to further the governmental interest of Spain and the decree purported to take property without compensation in violation of our public policy. Justice Stone in his concurring opinion in United States v. Belmont, 301 U.S. 324, 334, 335, 57 S.Ct. 758, 81 L.Ed. 1134, seems to imply that there is no policy in the State of New York against enforcing an expropriation decree merely because it furthers the governmental interest of a foreign state. He adds, however, that New York should be free to enforce a local policy subordinating the claim of a foreign government to local suitors. Accordingly the decree might be disregarded if it involved taking property within the State of New York without compensation. Vladikavkazeky R. Co. v. New York Trust Co., 263 N.Y. 369, 189 N.E. 456, 91 A.L.R. 1426. But there is no proof in the case before us that the owner was to receive no compensation for its vessel and the decree itself provided for assumption by the Spanish Republic of the obligations of the owner to creditors. Moreover, the Spanish Constitution (quoted above) appears to require payment of compensation in a case like the one before us and we should presume that its provisions would be regarded. In addition to this, the Navemar was not within the jurisdiction of the New York courts when the decree took effect.

Even if compensation was not to be made, we still should recognize the acts of a foreign state affecting property within its jurisdiction. In the present case, we are not enforcing claims of another state to property beyond its jurisdiction, as would have been the case if the subject-matter had been a chattel that was within the State of New York when the appropriation became effective. The situation here resembles that of the appropriation of tangibles within the confines of Spain which afterwards reached our shores. There we should recognize the title acquired under the laws of the foreign state. Oetjen v. Central Leather Co., 248 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726; Princess Paley Olga v. Weisz, (1929) 1 K.B. 718, 723, 731, 735, (C. A). Cf. Salimoff & Co. v. Standard Oil Co., 262 N.Y. 220, 186 N.E. 679, 89 A.L.R. 345. In either situation the decree of the

450

foreign state is recognized as passing title because jurisdiction is held to exist. When the Spanish decree became effective as to the Navemar she was on the high seas and recognition of it involved no conflict with our laws. Crapo v. Kelly, 16 Wall. 610, 631, 632, 21 L.Ed. 430.

For the foregoing reasons the decree of the court below is reversed, the libel is dismissed and the Navemar is ordered released from arrest and attachment and delivered to the Acting Consul General of Spain at New York pursuant to the prayer of the Spanish Ambassador.